E-FILED
Tuesday, 23 January, 2007  10:33:47 AM
Page 2
Clerk, U.S. District Court, ILCD

## PETITION UNDER 28 U.S.C. § 2254 FOR WRIT OF
## HABEAS CORPUS BY A PERSON IN STATE CUSTODY

OM-3020

| United States District Court | District |
|---|---|

| Name (under which you were convicted): Paula B. Mitchell | Docket or Case No.: 05 CF 1022 |
|---|---|

| Place of Confinement: I am serving a 2 year sentence of probation. | Prisoner No.: N/A |
|---|---|

| Petitioner (include the name under which you were convicted) | Respondent (authorized person having custody of petitioner) |
|---|---|
| Paula B. Mitchell    v. | State of Illinois and Sangamon County Adult Probation Dept. |

| The Attorney General of the State of | Illinois. |
|---|---|

**FILED**

### PETITION

JAN 2 2 2007

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

1.  (a) Name and location of court that entered the judgment of conviction you are challenging: Sangamon County Court. Sangamon Co. IL. 200 S. 9th St. Springfield IL 62701

    (b) Criminal docket or case number (if you know): 05 CF 1022

2.  (a) Date of the judgment of conviction (if you know): 1-23-06

    (b) Date of sentencing: 1-23-06.

3.  Length of sentence: 2 years probation and other terms.

4.  In this case, were you convicted on more than one count or of more than one crime? Yes ☑  No ☐

5.  Identify all crimes of which you were convicted and sentenced in this case: I believe I was convicted of 2 Misdemeanor counts of Battery. I was originally charged with 2 counts of A Felony Aggravated Assault & Battery.

6.  (a) What was your plea? (Check one)

    (1)  Not guilty ☐        (3)  Nolo contendere (no contest) ☐

    (2)  Guilty ☑           (4)  Insanity plea ☐

    (b) If you entered a guilty plea to one count or charge and a not guilty plea to another count or charge, what did you plead guilty to and what did you plead not guilty to? I plead guilty only because the State of Illinois had seemingly been able to get rid of every shred of evidence that could demonstrate my innocence. I believe I plead guilty to 2 misdemeanor counts of battery.

_____

_____

(c) If you went to trial, what kind of trial did you have? (Check one)

Jury ☑    Judge only ☐    *My case was plead out on the "Call To Trial" date.*

7. Did you testify at a pretrial hearing, trial, or a post-trial hearing?

Yes ☑  No ☐

8. Did you appeal from the judgment of conviction?

Yes ☐  No ☑

9. If you did appeal, answer the following:

(a) Name of court: _____ N/A

(b) Docket or case number (if you know): _____ N/A

(c) Result: _____ N/A

(d) Date of result (if you know): _____ N/A

(e) Citation to the case (if you know): _____

(f) Grounds raised: _____ N/A

_____

_____

_____

_____

_____

(g) Did you seek further review by a higher state court?    Yes ☐  No ☑

If yes, answer the following:

(1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Result: _____

_____

(4) Date of result (if you know): _____

(5) Citation to the case (if you know): _____

(6) Grounds raised: _____

_____

_____

_____

(h) Did you file a petition for certiorari in the United States Supreme Court?    Yes ☐  No ☑

If yes, answer the following:

(1) Docket or case number (if you know): _____ N/A

(2) Result: _____

_____

(3) Date of result (if you know): _____ N/A

(4) Citation to the case (if you know): _____

10. Other than the direct appeals listed above, have you previously filed any other petitions, applications, or motions concerning this judgment of conviction in any state court?

    Yes ☐ No ☑

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____

(5) Grounds raised: _____ N/A

_____

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?　　Yes ☐ No ☑

(7) Result: _____

(8) Date of result (if you know): _____

(b) If you filed any second petition, application, or motion, give the same information:

(1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____ N/A

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____    *N/A*    _____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?    Yes ☐ No ☐    *N/A*

(7) Result: _____

(8) Date of result (if you know): _____

(c) If you filed any third petition, application, or motion, give the same information:

(1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____

(5) Grounds raised: _____

_____    *N/A*    _____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your petition, application, or motion?    Yes ☐ No ☐    *N/A*

(7) Result: _____

(8) Date of result (if you know): _____

(d) Did you appeal to the highest state court having jurisdiction over the action taken on your petition, application, or motion?    *N/A*

(1)  First petition:    Yes ☐    No ☑

(2)  Second petition:    Yes ☐    No ☐

(3)  Third petition:    Yes ☐    No ☐

(e) If you did not appeal to the highest state court having jurisdiction, explain why you did not:

_____

_____

_____

Page 6

12. For this petition, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the <u>facts</u> supporting each ground.

<u>CAUTION: To proceed in the federal court, you must ordinarily first exhaust (use up) your available state-court remedies on each ground on which you request action by the federal court. Also, if you fail to set forth all the grounds in this petition, you may be barred from presenting additional grounds at a later date.</u> ★ ( Please see Bottom of page For Protest )

GROUND ONE: The defendant had an assirmative defense of duress + claimed she only struggled during the arrest because O. Staab Started grabbing her from behind W/o first informing her of the arrest and

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.): first giving her a chance to surrender peaceably The defendant feared for her safety or had an exaggerated Fright / slight reaction.

Supporting facts:
1. The defendant filed formal complaints w/ the officer's employer (State - IL) several times before she was indicted citing an illegal arrest that caused her duress.
2. The defendant set off her vehicle's panic alarm as verified by the AVR used to prosecute her.
3. Evidence now exists of perjury + evidence tampering on the part of State officials.

(b) If you did not exhaust your state remedies on Ground One, explain why: The defendant was only recently able to amass enough proof of the official misconduct that the State of IL officials + others used to deceptively mischaracterize her Fright/slight reaction as belligerence + conceal their wrongful Const. Rights violations.

(c) Direct Appeal of Ground One:

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐  No ☑

(2) If you did <u>not</u> raise this issue in your direct appeal, explain why: I was only recently able to amass proof of the evidence tampering and perjury.

(d) Post-Conviction Proceedings:

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?  Yes ☐  No ☑

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____ N/A _____

Name and location of the court where the motion or petition was filed: _____
I didn't have proof and the state of IL was the offender anyhow.

★ Protest 1) I was unable to file a petition for relief w/ the state court because I have reason to believe the state of IL violated my rights by tampering w/ the audiovisual tape recording of my arrest and I did not /was not able to locate proof of it before my statute of limitations expired. 2. the State of Illinois violated a number of my Const Rights + so appealing to them was useless.

Docket or case number (if you know): _____ *N/A*

Date of the court's decision: _____ *N/A*

Result (attach a copy of the court's opinion or order, if available): _____ *N/A*

_____

_____

(3) Did you receive a hearing on your motion or petition?

    Yes ☐  No ☐   *N/A*

(4) Did you appeal from the denial of your motion or petition?  *N/A*

    Yes ☐  No ☐

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

    Yes ☐  No ☐   *N/A*

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____ *N/A*

_____

Docket or case number (if you know): _____ *N/A*

Date of the court's decision: _____ *N/A*

Result (attach a copy of the court's opinion or order, if available): _____ *N/A*

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this

issue: _____ *N/A*

_____

_____

_____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative

remedies, etc.) that you have used to exhaust your state remedies on Ground One: *N/A*

   *I did not have proof before and the State of IL is the offender. However, I filed sev. complaints w/ Sev. State of IL Agencies (other than court offices) to no avail.*

GROUND TWO: *A denial of due process occurred because the arresting officers committed perjury 19 times in the discovery docket tendered to the Court.*

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

*The defendant was recently able to compare the audiovisual recording to the officer's written statements and there are a number of instances (19) where they don't match. The discrepancies are uniform in their application in that each one appears to be aimed at making the defendant appear belligerent/ non-compliant. That proves they are intentional acts of perjury rather than simple mistakes of fact. Additionally, the defendant filed formal complaints charging the primary arresting officer w/ official misconduct before w/ ACLU, NAACP, IL OIG, IL SOS, + State of IL. prosecutor before She was ever indicted. Her allegations are in part borne out by the audio visual recording.*

_____

_____

_____

(b) If you did not exhaust your state remedies on Ground Two, explain why: The defendant believes the recording of her arrest contained an intentionally placed obstruction to viewing in it. She had to press play every 40 sec(s) or so. In Aug, she had it repaired so she could identify proof of her innocence + was subsequently able to begin to amass proof --

(c)  Direct Appeal of Ground Two:    including the 19 counts of verifiable perjury. Statute expired before she could locate proof of her claim.

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ❑   No ❑   N/A

(2) If you did not raise this issue in your direct appeal, explain why: I was not able to access enough proof of my innocence before hand

_____

(d)  Post-Conviction Proceedings:

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?

Yes ❑   No ☑

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____ N/A

Name and location of the court where the motion or petition was filed: _____ N/A

_____

Docket or case number (if you know): _____ N/A

Date of the court's decision: _____ N/A

Result (attach a copy of the court's opinion or order, if available): _____ N/A

_____

_____

(3) Did you receive a hearing on your motion or petition?

Yes ❑   No ☑

(4) Did you appeal from the denial of your motion or petition?

Yes ❑   No ☑

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

Yes ❑   No ☑

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____ N/A

_____

Page 9

Docket or case number (if you know): _____ N/A _____

Date of the court's decision: _____ N/A _____

Result (attach a copy of the court's opinion or order, if available): _____ N/A _____

_____

_____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: 1.) The State of IL. was the entity involved in violating my rights. Their officer committed an unlawful + excessively violent arrest on me and they aided her in committing perjury and somehow permitted someone to tamper w/ my evidence. I knew it was done but was w/o recourse because I lacked proof before now.

(e) Other Remedies: Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Two: I filed numerous complaints w/ NAACP, ACLU, IL. SOS, IL. OIG, IL. State Prosecutor's Office, FBI, + other entities to no avail. Noone would investigate my case + I lacked enough proof to file an appeal. I have extensive copies of my written requests and of proofs of service and of written replies.

GROUND THREE: A denial of due process occurred because I have located enough info to make a strong preliminary showing that my audiovisual recording was falsified.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

1. The recording of my arrest contains at least 23 anomalies that are considered to be highly suggestive of evidence tampering by expert tape authenticators.

2. It is absolutely important because I believe they intentionally removed 8-10 min(s) worth of my car's panic alarm horn sounding and lights flickering -- evidence that could have proven I was under duress + not belligerent when she grabbed me. Other exculpatory info was removed also -- in violation of my compulsory right to exculp. info.

(b) If you did not exhaust your state remedies on Ground Three, explain why: In Aug, I repaired the tape so I could see it. That's when I realized the reason I could not see my car's panic alarm lights flickering beforehand was because most of them had been removed. The poor quality of the tape impeded me beforehand. I compiled my info as quickly as I could once I had proof.

(c) Direct Appeal of Ground Three:

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐ No ☑   N/A

(2) If you did not raise this issue in your direct appeal, explain why: The State of IL. actively + intentionally withheld exculp. info. from me and I was only recently able to amass enough proof to come back into court to request justice. I have known all along what they were doing but could not find enough proof beforehand.

**(d) Post-Conviction Proceedings:**

(1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?        Yes ☐ No ☑

(2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____ N / A

Name and location of the court where the motion or petition was filed: _____ N / A

Docket or case number (if you know): _____ N / A

Date of the court's decision: _____ N / A

Result (attach a copy of the court's opinion or order, if available): _____ N / A

(3) Did you receive a hearing on your motion or petition?

Yes ☐ No ☑

(4) Did you appeal from the denial of your motion or petition?

Yes ☐ No ☑

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐ No ☑

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____ N / A

Docket or case number (if you know): _____ N / A , A

Date of the court's decision: _____ N / A

Result (attach a copy of the court's opinion or order, if available): _____ N / A

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this issue: I was only recently able to amass enough proof of the impropriety involved. I had a tape that was falsisted + had to find a means an indirect means of proving what was done.

**(e) Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Three: I have filed numerous, vehement, + repeated requests for an investigation into the entire affair so my innocence could be proven. I filed w/ IL Sec. of State, IL OIG, ACLU, NAACP, IL State Prosecutor, the FBI to no avail. The State of IL. engaged in a malicious prosecution of me on the basis of tainted evidence (perjury + evidence tampering) in an effort to conceal the fiduciary duty they owed me for O. Staab's having harassed me + perpetrated an unlawful + excessively violent arrest on me.

**GROUND FOUR:** The prosecution out's use of perjured evidence + an obviously fabricated tape was a direct assault on the defendants assirmative defense.

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

1. The perjury consistently labels the desendant as belligerent which is a direct assault on her claim of consusion/ hysteria / duress/ panic.

2. The intentional removal of her screams + the siring of he panic alarm signifies a direct assault on her assirmative desense.

3. The osscers intentionally dont mention that the panic alarm sounded. The totality of circumstances show that the State of IL is malevolent toward the desendant and obtunded to the truth -- intentionally

(b) If you did not exhaust your state remedies on Ground Four, explain why: _____ The desendant only recently located enough proof of the tampering persormed on the recording she was prosecuted with. Evidence tampering in + of itsels places the ossender's claim in doubt because we must assume they got rid of evidence that helps my

(c) **Direct Appeal of Ground Four:** case.

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        Yes ❑   No ☑

    (2) If you did not raise this issue in your direct appeal, explain why: The statute expired besore I could amass enough proof of impropiety.

(d) **Post-Conviction Proceedings:**

    (1) Did you raise this issue through a post-conviction motion or petition for habeas corpus in a state trial court?        Yes ❑ No ☑

    (2) If your answer to Question (d)(1) is "Yes," state:

Type of motion or petition: _____ N/A

Name and location of the court where the motion or petition was filed: _____ N/A

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____ N/A

_____

    (3) Did you receive a hearing on your motion or petition?

        Yes ❑   No ☑

    (4) Did you appeal from the denial of your motion or petition?   N/A

        Yes ❑   No ☑

Page 12

(5) If your answer to Question (d)(4) is "Yes," did you raise this issue in the appeal?

Yes ☐ No ☑

(6) If your answer to Question (d)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____ N/A _____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____ N/A _____

(7) If your answer to Question (d)(4) or Question (d)(5) is "No," explain why you did not raise this

issue: _____ N/A _____

(e) **Other Remedies:** Describe any other procedures (such as habeas corpus, administrative remedies, etc.) that you have used to exhaust your state remedies on Ground Four: I have filed numerous complaints requesting an investigation into the first offenses which could have resulted in relief (ACLU, NAACP, OIG, SOS, etc) but all were denied. I now have proof that State of IL. personnel tampered w/ my evidence. Such culpability renders

13. Please answer these additional questions about the petition you are filing: any appeal motion meaning-less on its face.

   (a) Have all grounds for relief that you have raised in this petition been presented to the highest
      state court having jurisdiction?        Yes ☐ No ☑

      If your answer is "No," state which grounds have not been so presented and give your
      reason(s) for not presenting them: I did not go to the State Courts because the State is violating my rights + concealing crimes they committed against me. In addition, their statutes expired before I had amassed enough proof of my claims to proceed

   (b) Is there any ground in this petition that has not been presented in some state or federal
      court? If so, which ground or grounds have not been presented, and state your reasons for
      not presenting them: None have been previously heard because the State Court would have been of no use since they are culpable in this matter and their statutes expired before I had proof of my claim. I am entitled to Fed. aid due to State Impropriety

14. Have you previously filed any type of petition, application, or motion in a federal court regarding
   the conviction that you challenge in this petition?        Yes ☐ No ☐

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, the issues raised, the date of the court's decision, and the result for each petition, application, or motion filed.  Attach a copy of any court opinion or order, if available. _____

N / A

15. Do you have any petition or appeal now pending (filed and not decided yet) in any court, either state or federal, for the judgment you are challenging?    Yes ☐    No ☑

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised. _____ N / A _____

16. Give the name and address, if you know, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: Sari B. Fiscus  4330 W. Wabash Springsfield  IL. 62704

(b) At arraignment and plea: Sari B. Fiscus  4330 W. Wabash Springsfield IL. 62704

(c) At trial: Sari B. Fiscus  4330 W. Sprin Wabash Spsfd 62704 A case was plead out @ "call to trial stage."

(d) At sentencing: Same  /  N/A

(e) On appeal: N/A

(f) In any post-conviction proceeding: N/A

(g) On appeal from any ruling against you in a post-conviction proceeding: N / A

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?    Yes ☐    No ☑

(a) If so, give name and location of court that imposed the other sentence you will serve in the future: _____ _N A_____

(b) Give the date the other sentence was imposed: _____ _N A_____

(c) Give the length of the other sentence: _____ _N / A_____

(d) Have you filed, or do you plan to file, any petition that challenges the judgment or sentence to be served in the future?    Yes ❑  No ❑  _N / A_

18.  TIMELINESS OF PETITION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2244(d) does not bar your petition.* _____ _N / A___ _I am filing timely._

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2244(d) provides in part that:

(1)  A one-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of —

(continued...)

Page 15

Therefore, petitioner asks that the Court grant the following relief: The recording used to prosecute the defendant needs to be authenticated by a non-law enforcement entity at State expense and the defendant requests 47 other forms of relief as or any other relief to which petitioner may be entitled. noted in her legal briefs which she is or will be submitting to the court.

_Paula B Mitchell_  PRO SE

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Petition for Writ of Habeas Corpus was placed in the prison mailing system on

_____N / A_____ (month, date, year).

Executed (signed) on ____1-16-07____ (date).

_Paula B. Mitchell_

Signature of Petitioner

_____

*(...continued)
(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such state action;
(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

If the person signing is not petitioner, state relationship to petitioner and explain why petitioner is not signing this petition. _____ *N/A* _____

_____

_____

### IN FORMA PAUPERIS DECLARATION

_____

[Insert appropriate court]

* * * * *

Appeal 1

Reasonable Doubt Exists.

1. The defendant had an affirmative defense of duress which the State of IL. Prosecutor,
   State of IL. Office of Inspector General, Secretary of State Police Administration,
   Captain Pippen- IL. Sec. of State Police, Officer Staab- IL. Sec. of State Police,
   Officer Copeland- Southern View Police, and others knew about and attempted to
   conceal.

2. The defendant's claims are partially corroborated by the Audio-visual recording (AVR)
   of the incident.

Attempt(s) were made to conceal not only the fact that the defendant had an affirmative defense w/ regard to
the charges filed; but also to conceal the fact that from the beginning the defendant alleged that Officer
Staab violated her Constitutional Rights by harassing her and then perpetrating an un-
Constitutional/groundless arrest.

The defendant filed a 7/05 pre-indictment letter of formal complaint against Officer Staab with the IL.
Office of Inspector General (IL. OIG), IL. Secretary of State (IL SOS), and
forwarded portions of her formal complaint to the State of IL. Prosecutor's office.  A photocopy of the U.S.
Post Office's Certifications of Delivery is attached. (Exhibits 0003, 0004, 0005, 0006, 0007, 0008, 0009,
0010, 0011, 0012, 0013,  & 0014).

The formal complaint alleges that the arrest was Un-Constitutional in that the defendant had not broken any
laws at the time when Officer Staab initiated the arrest.

The complaint further alleges that the defendant did not know that she was being arrested (but rather
thought she was being assaulted) because Officer Staab merely grabbed her arm
without uttering a word. The Audiovisual recording of the incident partially corroborates the defendant's
story because it shows that Officer Staab had merely approximately 6 seconds in which to inform the
defendant of the arrest, make request(s) of her and witness a refusal.  Additionally, on the Audiovisual
recording, Officer Staab isn't overheard telling the defendant anything at the time she grabbed her.  Therein,
we seemingly hear everything she has to say.  We hear her allegedly make 4 different statements at different
times on the Audiovisual recording.  The only other sound appearing on the approximately 20 minute long
tape is the sound of the defendant saying the word bitch.  The defendant has reason to believe that at least
two of the statements Officer Staab is overheard making on that tape are the result of over-taping (see
below).  The defendant asserts that the only reason we don't hear Officer Staab making such statements to
the defendant is because she did not do so the night of the incident and there was not enough time available
on the tape for them to insert such information without a high probability of being discovered-- again
because 6 seconds isn't long enough for her to complete all three of those steps.  Additionally, Officer Staab
stated in her written statement that has tendered to the court during the discovery hearing that she ,
 " stepped up behind her and advised she was under arrest for obstructing and reached to cuff her right
wrist…"  Exhibit 0014, lines 52 & 53.  Officer Copeland stated, "Officer Staab asked the female driver to
place her hands behind her back, she was going to be placed under arrest.  Officer Staab attempted to grab
her wrist, to place the handcuff on it…" Exhibit 0014 Lines 14- 16.  It is highly unlikely that all of this
occurred within the 6 seconds that occurred from the time I stopped shouting as shown on tape to the time
Officer Staab is seen grabbing at my left wrist on  video. 23-30-47 or 23-30-50 thru 23-30-53.  In fact, It
takes approximately 7 seconds to state, "You're under arrest for obstructing, put your hands behind your
back."  Even if they are given credit for having said it, there is not one shred of evidence to suggest that I

Appeal 2

had been given an opportunity to even hear/understand it; let alone an opportunity to react to any such message.

Furthermore, both Officers appear to be attempting to give the impression that they had handcuffs readily available for use & thereby somehow demonstrate that I would have had to know that I was being placed under arrest. However, a critical review of the audiovisual recording demonstrates entirely the opposite. Frames 23-30-43, 23-30-52, and 23-30-54 demonstrate that Officer Staab doesn't have cuffs in her hands. She's walking, & pointing, & has one hand apparently on her belt but she doesn't appear to have cuffs out, etc. The same is true of Officer Copeland. Frame 23-30-43 shows his hands at his side & bearing no cuffs. In frames 23-30-54 & 23-30-56 he's seen grasping my arms w/ both hands. There are no cuffs in his hands! (Exhibit 0002 Audiovisual recording used by prosecution).

The defendant alleged that she repeatedly screamed inquiries of what are you doing, I can't breathe, Please, God, Please, etc & set off her car's panic alarm due to the confusion and duress surrounding the arrest.

The defendant's claims are partially corroborated by the Audio-visual Recording (AVR) of the incident.

Officer Staab is seen grabbing the defendant from behind and though the film is of poor quality, she doesn't appear to have said a word. She is seen grabbing me twice in frames 23-30-53 and 23-30-55.(See section of Implied perjury pg.    )

Without question, the defendant did indeed initiate her vehicle's panic alarm during the time of the arrest. The rear lights of the 2004 Pontiac Grand Am can clearly be seen  flickering in frames 23-31-23 thru 23-31-27 and in frames 23-31-46 thru 23-31-48. The very act of intentionally setting off the vehicle's panic alarm in and of itself represents a Gestural Excited Utterance-- an indication of panic/hysteria/duress regardless of it's disputed duration.

In the defendant's 7/05 pre-indictment formal complaint filed against Officer Staab, she alleges that she set the panic alarm off a total of some 4-5 times and let it run while she repeatedly screamed various things. Initially, her screams were those of inquiry and confusion w/ regard to what was occurring.  Later, her screams were that the initiating Officer ( Staab) was a, "Lying Fucking Bitch."  The defendant alleges that she had screamed such things because she was pushed over the edge and was hysterical about Officer Staab's having told several lies about her in order to maneuver the situation into one in which she would be arrested.

The police make no mention of the vehicle's panic alarm system having been activated at all. Further, they characterize the defendant's verbal exhortations as being only those of an abusive nature.  However, the defendant will herein demonstrate the fact that the arresting Officers have animosity which they directed towards the defendant numerous times.  She will demonstrate that the two primary arresting Officers are prolific liars and tendered documents to the court riddled with intentional inaccuracies in an attempt to wrongfully convict her due to this animosity.  The defendant charges that the Officers deliberately omit the information about the vehicle's panic alarm because they are knowingly concealing this exculpatory information from the jury.  The defendant will also demonstrate to the court sufficient reason why the audiovisual recording used to convict her should be thoroughly evaluated by an expert authenticator since it contains numerous & readily observable anomalies which are often indicative of unauthorized editing.  One such anomaly is suggestive of several minutes' worth of tape having been removed from the AVR which would have contained the prolonged firing of my vehicle's lights.  The lights are synchronized with intermittent horn blasts and sound for a total of 2 minutes whenever the car's panic alarm is initiated-- unless the alarm is overridden by a person in control of the vehicle's key fob.  The manner in which the defendant's vehicle's panic alarm functions can be reviewed in Exhibits 0015 & 0016.

The defendant's version of events is partially corroborated by Officer Staab's written report wherein she writes that the defendant's brother immediately challenged the arrest; "He stated I could not take someone to jail because they called me names. Exhibit 0014 Line 96. In a written document I tendered to the NAACP, ACLU, and others; I wrote that I had Spring phone my brother because, "I wanted to make certain there

could be someone at the scene who could take custody of our children in the event Spring got baited into something as well." Exhibit 3 Lines 134- 137. The entire write up was given to Atty. John Noll on approx. Sat 7/9/06. and was mailed to the NAACP & the ACLU approx. later the following week. In addition, pages 5-9 (Traffic Stop section) of the write-up accompanied the formal letters of complaint I forwarded to IL. OIG, IL. SOS J. White, and the letter of protest I filed with the State of IL. Prosecutor's Office. The duplicate copy of the Prosecutor's document is attached. Thus, Officer Staab's written mention of her conversation with my brother helps confirm the fact that both I and my family protested the arrest from the very beginning. He was on the phone because I requested Spring phone him. He charges her with having arrested me simply because I called her names, etc. because of what little information I was able to give to him before I got out of the car.

Reasonable Doubt also exists because the motivations of the rush to judgment on behalf of the State of IL. Prosecutor, IL. Secretary of State Police Office, and the dereliction to duty of the State of IL. OIG is at least questionable. They are charged with safeguarding the public. I forwarded them timely complaints of rights violations which they should have investigated if for no reason other than to ensure the safety of other persons who could come into contact with that Officer in the future and yet they ignored that complaint. (See Denial of Due Process Write-ups below).

Reasonable doubt exists because I can prove both primary Officers involved in the arrest/incident committed repeated instances of perjury designed to make me look extremely aggressive & belligerent and with the intent of securing a wrongful conviction. If they were in fact simply doing their jobs; why did they find it necessary to lie repeatedly on document(s) they knew would become part of the official court record? These are lies (perjury) because they are consistent in their application-- making me look aggressive and in mis-characterizing my actions as being those of belligerence as opposed to having occurred as a matter of confusion and/or out of a fight/flight reaction.

Reasonable doubt exists because a very strong preliminary case can be made for the fact that the AVR used to prosecute me has had extensive surreptitious editing performed on it. Again, if the Officers and Agencies involved in the case are being forthright; then why did they find it necessary to surreptitiously edit the recording?

A Denial of Due Process Exists because the State of IL. (SOS Police, SOS, OIG, State Prosecutor, et. al) had an obligation to investigate the defendant's claim that crimes had been committed against her by Officer Staab. That is so because they are required to protect the public from repeated such abuses by her. They were also obligated to investigate the defendant's claim(s) because they knew or should have known that such unethical conduct on the part of Officer Staab could result in a malicious prosecution and wrongful conviction of an innocent person if they failed to act appropriately. Though each office has discretionary powers-- said powers does not entitle them to be willfully blind or ignorant to the commission of crimes against any person. Their option to remain aloof ends where the possibility for the furtherance of abuse against another person begins. Though they had an ethical and legal duty do act, they willingly neglected that duty with wanton and reckless disregard for the untoward effects their inaction would have on the defendant, her innocent minor child, and her extended family members.

All the aforementioned State agencies received timely notice of the defendant's 7/05 pre- indictment formal complaint. Yet, none acted responsibly. That the State of Illinois had a financial motivation to assume such a stance only makes their repeated refusals for an investigation all the more onerous and abhorrent.

The State of IL. OIG opted to permit the IL. SOS to take the lead in the investigation though they admitted they would remain involved to render any necessary technical assistance. They knew or should have known that the refusal of the Sec. of State & of the Sec. of State Police Office's decisions to refuse an investigation opened up liability for them. Nevertheless, they failed to act.

The State of IL. Prosecutor's Office had 3 years within which to formally charge me with the alleged law violations and yet he/they chose to move forward with a selective & vindictive prosecution using tainted

evidence in an obvious rush to judgment. His 8/05 indictment clearly demonstrates a complete lack of regard for any truth other than the version the State prefers-- one in which they can avoid the payment of well deserved reparations to the defendant.

In September 2005, I contacted IL. SOS Capt. Pippen. He told me that the AVR was entered into evidence and that his department takes no action on such complaints so long as there is a court case pending. Note that once the case was plead out I contacted the IL SOS again and requested an investigation which was refused. Their letter, written in venomous, aloof, and abusive tone, is attached. (Exhibit 0068).

The sum total of evidence demonstrates that the State of IL. was in a rush to convict me whether or not I was guilty in order to keep from paying my family the reparations owed us.

A Denial of Due Process exists because the State of IL. Prosecutor tendered to the State a perjurious Pre-Trial Discovery Document stating: "The State does not have within its possession or control any material or information which tend to negate the guilty of the accused as to the offense charged or would tend to reduce his punishment thereafter." (Exhibit 0014).

This was obviously untrue. In the first place, they had my letter of affirmative defense and my allegation of serious mis-conduct on the part of O. Staab. Additionally, they had the AVR material. Professional ethics suggests that they refuse to prosecute anyone with such an AVR unless they first have it authenticated-- particularly in light of the totality of the circumstances surrounding this case and the sheer number of anomalies noted therein. The obviously poor quality of the tape was such that it was easily observed by anyone who would attempt to review it and therefore was absolutely no surprise to him. · Again, ethical conduct would dictate due diligence which he obviously did not even attempt to practice.

A Denial of Due Process exists because the State of IL. prosecuted the defendant with tainted evidence in that the police officers tendered perjurious documents to the court and are herein impeached by the State's own AVR of the event. That the AVR can be used to impeach the testimony of the arresting officers even after it has so obviously been subjected to multiple edits is particularly noteworthy.

Perjury #1 (Staab). "Copeland and I returned to the drivers door. "Line 49. Per the AVR, only O. Staab walked up to the driver's side door of the car. O. Copeland stays at the rear portion of the vehicle. It appears this lie is being told to demonstrate my having been given every opportunity to cooperate and yet I refuse to obey not one, but 2 officers. It is material in that it represents an attempt to paint me as a belligerent uncooperative person wrongfully. (Exhibit 0014).

Perjury #2 (Staab) She screamed, "I don't have to give you shit, just leave me the fuck alone." (Exhibit 0014 Lines 50-21). This portion of tape is difficult for me to discuss because I suggest that what is seen on tape has been edited and that portions of the situation are out of sequence. In my write-up, I claimed that I was facing forward talking to my brother on my cell phone when Officer Staab came to the driver's door after the back-up officers arrived. I didn't know she was standing beside my vehicle's door until she yelled at me. I also didn't know the back-up officers had arrived until I got out of the vehicle and shouted that she was lying & needed to move in order for me to retrieve the documents which was the exact same thing I said before you (O. Copeland) got here! I write, "the Officer came up and stated something like, "Are you talking to another Officer?" I lied to her and stated, "I'm talking to my attorney because my brother was just finishing up a sentence and I wanted to be able to tell him, "ok, bye" and hand the phone to Spring so he wouldn't get too upset wondering why I dropped off the line abruptly." (Exhibit 0003 Lines 154-158). I continued to state that I held up my left hand w/ the index finger pointing up to indicate that I was closing the call but she started talking again and I didn't hear her or my brother. I wrote that she started talking and walking away from the vehicle.

The AVR purports to show O. Staab telling O. Copeland that she asked me for the things, I refused to give them to her and I was going to be arrested when I got out of the car. It's interesting to note that we don't hear a response from O. Copeland. Perhaps he only nodded acquiescence to her or perhaps her statements

represent an unauthorized edit override. That conversation could be authentic or it could have been recorded in Pocoima. Note that neither Officers are visible on screen at the time. I don't know whether that conversation ever happened or not because I was facing forward and wouldn't likely have heard it. Exhibits 001 &002, Frames 23-29-26 thru 23-29-32.

Then, the AVR's picture drops out in frame 23-30-08. While it's out, we hear O. Staab stating, "Show your license and insurance card." Frames 23-30-17- 23-3018. The picture comes back in at 23-30-20. *Again, this could easily be an editing insert because audio is very easy to add to an AVR. The absence of accompanying video is particularly questionable.

O. Staab is heard inquiring, "Are you refusing to obey a police officer?" Frames 23-30-24 to 23-30-26.

Note the similarity between the inquiries, "Are you talking to another officer/Are you refusing to obey a police officer? This statement shows a point of intersection between my formal written complaint and the AVR. Note that on the AVR I am not heard to reply but in my writing I claim to have answered her. My answer was inappropriate because I didn't hear her correctly.

In my formal complaint I write, "Before I could hear him finish, I heard the Officer announcing something very loudly. She sounded as if she was making an effort to have all the newly arriving Officers hear her. She was saying something to the effect of, "I asked her for it and she stated she wasn't going to give it to me no matter what!" (Exhibit 0003 Lines 164- 167). I continue, "I got out of the car to try one final time to either de-escalate the situation or take it away from where the children were. I started yelling as loud as I could, "You lying, fucking bitch, that's not what I said and you know it." Line 173.
I continued in line 181. "Move and I'll get them for you which is exactly what I said before you got here!"

O. Staab's claim that I said, "I don't have to give you shit, just leave me the fuck alone," can not be true. Per the AVR, as soon as I completed my statement I leaned over and retrieved my key fob from the vehicle and I immediately started walking toward the trunk area of the car. The Justice system regularly looks at what someone takes with them in order to imply guilt or innocence (ie. murder weapons). Why would anyone in their right mind scream, " I don't have to give you shit," and then take 2 immediate affirmative steps toward retrieving the articles (ie. getting keys and proceeding to the trunk)? It is 1000 times more likely that I said what I claim I said and not what O. Staab is asserting. Her statement is a bold-faced lie. Furthermore, my statement was written & tendered to several agencies & persons months before the Discovery Packet was ever tendered to me as per the various U.S. Postal verifications. HOW CAN ANYONE TELL LIES ABOUT WHAT SOMEONE ELSE IS GOING TO SAY BEFORE THEY EVEN SAY IT? The very fact that my statement was written first and appears to be corroborated by the AVR even after it was obviously fabricated absolutely verifies that the Officers are lying! Again, this lie is material and mean spirited. It represents yet another attempt to make me look despicable to jurors so that I won't have a prayer of being able to get them to hear me & consider the possibility of the truth-- that my rights were violated and that a concerted conspiracy was underway to deprive me of additional rights in an effort to conceal the initial violations. (Exhibits 001 & 002 audiovisual material, 0003 my write-up, and 0014 Discovery Packet).

Perjury #3. (O. Staab). She writes, "I stepped up behind her and advised she was under arrest for obstructing and reached to cuff her left hand. (Exhibit 0014). Per the AVR, I was screaming from frames 23-30-42 until 23-30-47 and then I added a couple of words or so onto my statement in frames 23-30-49 thru 23-30-50. In frames 23-30-52 thru 23-30-53, O. Staab gestures and reaches for my shoulder but apparently doesn't say a word and I'm seen flinching/pulling away. Staab's left hand is seen grabbing at my left wrist or arm twice in frames 23-30-53 thru 23-30-54. Only 3- 6 seconds worth of time elapse from the time I finish talking until the time she is seen making aggressive moves toward arresting me. Even if she is able to Squeeze the words, "You're under arrest for obstructing, put your hands behind your back," into that space of time it wouldn't have given me a fair opportunity to reflect upon what she said so that I would have been prepared to re-act appropriately. It appears that this lie is intended to correlate to O. Copeland's statement that she informed me of the arrest and I refused to put my arms behind my back. I claimed in my

7/05 pre-indictment write-up that I wasn't ever given an opportunity to surrender peaceably. This statement appears to be a direct attempt to conceal the unlawful arrest and the fact that said arrest was accompanied by an excessive amount of physical force. There simply wasn't time for her to have informed me of the arrest AND afforded me a decent opportunity to respond to any such request. (Exhibits 0003 & 0014).

\*\*\* Note that per the AVR, neither officers had cuffs in their hands and yet both make repeated statements about all the attempts that were being made to "cuff" me. Though that may have been their INTENTION, the absence of their having had any cuffs in their hands does lend greater credibility to my assertion that I thought I was being assaulted. Just before the struggle ensues, there are frames that demonstrate that neither officer had handcuffs out. Frame 23-30-39 shows that O. Staab had not cuffs in her hands. Frame 23-30-38 demonstrates that he didn't have cuffs in his hands.

Perjury #4. (O. Staab). She writes, "She scratched my arm and pulled away." Per the AVR, the first time O. Staab is seen grabbing at my arm there doesn't appear to have been any contact made-- surely not enough for me to have scratched her. (Exhibits 0001 & 0002).

Perjury #5. (O. Staab) She writes, "She dug her fingernails into my left wrist drawing blood when I held her left wrist to cuff her. She would not let go." As aforementioned, Frames 23-30-53 thru 23-30-54 show That O. Staab is seen grabbing at my arm twice. I didn't grab her. She is grabbing me! In addition, the hand doesn't work as the officers describe. In order for a person to grasp someone's wrist tightly enough to prevent them from snatching it free they have to almost completely oppose the thumb and fingers. As soon as you super-pronate the fingertips in order to scratch someone deeply you would create an opening that the person could easily slide their wrist through. Additionally, O. Staab's scratches to her arm were long and longitudinal, but scratches made in the manner in which they describe would have been slightly circumferential and short. Finally, according to the AVR O. Staab was able to freely use her left arm in order to key the microphone and request back-up. In Frames 23-31-09 thru 23-31-10 we hear the microphone key open and hear her calling for, "another unit." One final and telling issue is that only 16 seconds elapses for this scratching incident to occur-- 23-30-53 thru 23-31-09. Even if this happened, it wouldn't count as an unrelenting grip such as that described by the officers in stating, "She would not let go." In truth, o. Staab's arm was scratched in the manner I described in my 7/05 pre-indictment write-up. I write, "I started grabbing hold of my pants to try to stabilize my arm so they could get the cuffs on me w/o too much more trauma because they were hurting my arms when they pulled them back as far as they did. I held on to my shorts for a time but they pulled my arm free and when I grabbed for my shorts again I ended up scratching someone. I didn't know whom and I hadn't intended to do so." (Exhibit 0003 Lines 208- 212. At the time when her arm got scratched, I was face down on the grassy knoll with 4 or more people on top of me. I was struggling to breathe and trying to cooperate as much as possible. Yet again, they aren't telling the truth about something because they want to characterize me as belligerent and make me look despicable to the jury so that no one will care about the truth. Also, yet again, my statement can be somewhat corroborated by the AVR evidence and was tendered to a number of agencies & people months before I ever even saw their statements. Yet again, I must point out that it would have been impossible for me to tell lies about what they were saying BEFORE they even said it. How could I know to make up a lie like that BEFOREHAND?

Perjury #6. (O. Staab) She writes, "She kicked me twice in the abdomen and pelvic area."
If you watch the AVR closely from frames 23-30-53 when O. Staab starts grabbing for my left arm thru frame 23-31-22 when she leaves the film; you will note that this never happens. The AVR shows her grabbing for my left arm twice. Then, I become too absorbed with O. Copeland because I see him coming for me. I raise my right leg and apparently begin trying to kick and /or push him back. The struggle continues as we begin to traverse toward the right of the screen. When we're approximately in front of the right rear vehicle lights O. Staab is seen wrapping her right leg around my left leg and using it to entrap me. I fall down and the struggle proceeds toward the right of screen. At that point we all basically fall forward onto the grassy area and when we fall O. Staab exits the screen. This is one of the ugliest acts of perjury detailed herein. Per the AVR, such kicks never happened. Yet, O. Staab proceeded to a local Hospital Emergency Room and racked up a bill in excess of $3100.00-- a bill which the State of IL (et.al) are currently extorting from me as part of my plea negotiation agreement. In fact, their entire case was built

around prosecuting me for this and now I have amassed verification of the fact that the particular kicks she describes NEVER HAPPENED!!!

AVR Transcription:
23-30-50 She's grabbing my left arm/wrist from behind and both my feet are visible and planted on the ground.
23-30-54 She moves up closer behind me & still both my feet are on the ground.
23-30-55 My Left foot is on the ground and my right foot is seen striking Officer Copeland.
23-30-56 & 23-30-57 are basically the same. I'm kicking @ Officer Copeland and no strikes to her abdomen or pelvis are noted.
23-30-57- 23-30-58 my feet are still seen kicking but they miss her. My right leg missed even hitting her lower leg by quite a bit per the tape.
23-31-04 both officers have my legs pinned between my vehicle and their legs.
23-31-06 My left leg comes up and passes between O. Staab's legs and she pins it w/ her thigh. I am seen trying to pull my left leg free & retain my balance by pulling my body weight with my right foot--attempting to walk to the right and O. Staab's legs are clearly seen gripping mine in a direct effort to trip me in frames 23-31-04 thru 23-31-13.
23-31-13 I fall to my knees.
23-31-13 thru 23-31-22 we move right as a group until I finally fall face down on the ground & O. Staab falls to the right of screen and out of view. After this point nothing is seen of my body on film other than my foot and it's always seen on the ground as if I'm lying there kicking, etc. SHE NEVER SUSTAINS A KICK TO HER ABDOMINAL OR PELVIC AREA AND YET SHE FILES PAPERWORK WITH A HOSPITAL, THE COURT, AND WORKER'S COMPENSATION STATING TO THE EFFECT THAT SHE DID! Criminal penalties apply to anyone who files perjurious documents with the court and with Worker's Compensation and yet this Uniformed Officer does so in order to entrap and imprison an innocent single parent!


Perjury #7 & 8. (O. Staab) She writes, "I instructed the intern riding with me to call for additional assistance on the radio due to the resistance of the driver. The driver continued to dig her nails into my wrist and use her feet to kick at us. Obviously, according to the AVR, O. Staab called for the additional units herself (Frames 23-31-09 and 23-31-10). Additionally, if her arm was free to call for said assistance then I could not have "CONTINUED" to dig my nails into her wrist. Had it occurred, it would have constituted a new assault-- not a continuation of the previous grip. Obviously, she is lying when she stated that she directed the intern to phone for additional assistance. The motivation to assert this would likely be that she doesn't want to draw attention to the fact that she has free use of her left arm. That would serve as verification of the fact that she is lying! Again, the discrepancy paints me in an ugly light.

Without wasting a lot of unnecessary time, I will simply mention that page 1 of O. Staab's report is no better than her second page of testimony. I count a total of 9 lies on that page. The ugliest lie was that I attempted to push open the driver's door and she caught it from striking her. I will simply conclude by saying that it would not be a gross mischaracterization if I were to state that O. Staab seemingly correctly related the names of the people involved and the place where the incident took place; cut to lying and didn't come up for air until she was finished 4 pages later. Page 3 of her report contains information about the treatment she obtained at the local ER. for the kicks she supposedly sustained to her abdomen-- which aren't witnessed on videotape. That the doctor had concerns about a possible injury to her spleen (left lower abdominal quadrant) when that portion of her body was apparently never within striking range per the AVR is particularly noteworthy. Lines 118- 130.

Additionally, her report of the "incident" that resulted in Correctional Officer Tom Ansell's being scratched represents hearsay because it's something that she apparently didn't observe directly. My version of the event and their version differ but notice the pattern. Again, there is an apparent characterization of the scratch as being belligerent-- yet the Officers have already been shown to deliver unreliable testimony on a regular basis. I have made every attempt to be truthful from the very beginning.

O. Staab's page 4 involvement with regard to the Allegations made by O. Copeland asserting that I threatened them with my job are hearsay likewise and again questionable in that they fit right into the pattern of a gross mischaracterization of a conversation by primary witnesses who are notoriously unreliable. Lines 132- 157.  My story concerning the Officers' claims that I threatened them with my job are contained in Exhibit 0057.  That document was forwarded to the NAACP and others along with formal complaints and requests for assistance in approx July 2005.

O. Staab repeats her perjurious statements on the Sangamon County Sheriff's Office Field Booking and Probable Cause Statements.

Perjury 9-11.  (O. Staab)  *Line 13 That the defendant was combative, resisted, and assaulted personnel during the arrest. Her failure to mention the defendant's verbal statements indicative of confusion and the firing of the vehicle's panic alarm suggests that exculpatory information was being withheld yet again in order to mischaracterize the defendant's actions. The intentional mis-characterization of the acts as (combative, resisting, assaulting) represents perjury.

Perjury #12. (O. Staab)  *Line 23 That: She was advised she was under arrest for obstructing.  (3-6 seconds isn't sufficient time to convey such information.

Perjury #13.  (O. Staab)  *Line 24 she began striking, kicking, and scratching at me.  The defendant wasn't observed striking O. Staab on the AVR.

Perjury #14.  (O. Copeland).  He writes, "We both approached the motorist." Line 10.  Per the AVR, only O. Staab approached the driver's door.

Perjury #15.  (O. Copeland).  He writes, "The driver became irate and got out of the vehicle and began screaming, "I don't have to give you shit.  Just leave me the fuck alone." Lines 11- 13.  Again, this is obviously perjurious because no person in their right mind would refuse in such a nasty manner and immediately thereafter retrieve keys and head toward the trunk to retrieve the documents.

Perjury #16.  (O. Copeland).  He writes, "O. Staab asked the female driver to place her hands behind her back, she was going to be placed under arrest." Line 4- 15.  Again, 3-6 seconds isn't a sufficient amount of time in which to accomplish such a feat and the defendant alleged that this was not done in her write-up.

Perjury #17.  (O. Copeland).  He writes, "Officer Staab attempted to grab her wrist, to place the handcuff on it, but the driver pulled away." Lines 16- 17.  Though she is seen grabbing at my wrist, she had no cuff in her hand as per AVR frame 23-30-3. They couldn't have informed me of an impending arrest in 3-6 seconds and the fact that neither of them had cuffs at the ready but both claim they were trying to cuff me and I refused is telling.  Again, they are trying to dispute my affirmative defense.  They are asserting that I was informed of the arrest and that the amount of force was justified because I was resisting (as in pulling away).

Perjury #18. (O. Copeland).  He writes, "I then grabbed the females wrist and was able to get one cuff on her left hand; but she fought and kicked at me and hit my leg several times while trying to resist and escape." Lines 17- 19.  This is a particularly ugly act of perjury and quite an easy one to find out.  He claims he grabbed my wrist and was able to get one cuff on my left hand.  He had been standing to my right and again had no cuff.  Where did the cuff come from?  Additionally, he specifically states that he was able to get a cuff on my left hand but I fought and kicked at him and hit him... He is obviously trying to state that he was able to get a cuff on my left hand because it would help him establish 2 things. First, since he is standing to my right; he would have to pass a cuff in front of me in order to be able to get it on my left wrist.  That is a direct & illegal  attempt to deprive me of my affirmative defense. It's a sneaky way of asserting that there was no way I could possibly not have known they were trying to arrest me if the cuff passed directly in front of me.  Additionally, the fact that he characterizes my actions as trying to resist and escape is particularly telling.  He's painting me in an extremely negative manner. He is attempting to characterize me as being the kind of person who would intentionally assault an officer.  Yet, he's obviously

lying. As already established-- neither of them had a cuff in their hands immediately prior to the struggle. Additionally, a review of frames 23-30-53 thru 23-31-22 when O. Staab leaves the screen clearly demonstrates the fact that he was never in a position to even observe my left arm-- let alone place a cuff on it. He was too busy dealing with my right arm. Finally, please note that between the two of them (o. Staab & Copeland) they are able to cuff all 3 of my arms. (O. Copeland writes here that he was able to place a cuff on my left wrist. O. Staab writes, "I held her wrist in my left hand and my cuff in my right. After several minutes of struggling with her I was able to cuff her wrist and bring it to her back. Copeland was able to get her right wrist from in front of her chest to behind her back and get it cuffed. Lines 67- 72. ** I do hereby swear and affirm that I have no such anomaly. I have and always have had only 2 arms and would be more than happy to ask for my Physician's certification of such-- should it please the Court.

Again, there are a number of other instances of perjury listed in O. Copeland's write-up. However, I am unable to prove that he is lying because there is apparently no AVR to compare his statements to. He also alleges that I was combative even after having been handcuffed and refused to comply with the requests/procedures of the jail personnel. However, I must assert at this time that if I wasn't being belligerent at the time of arrest and my acts were so intentionally and grossly mischaracterized; then I absolutely would not have been belligerent at any other time. If, at the height of confusion and duress, I was not belligerent and the Officers are known to have been lying-- then I was not belligerent and aggressive at any other time. The law enforcement personnel are just consistently and intentionally grossly mischaracterizing my actions as being belligerent and aggressive because they have something to hide (an Un-Constitutional Arrest characterized by an Excessive Use of Force that resulted in injury to at least 2 persons). They are simply employing a pattern/formula that they can rely upon to achieve their objectives.

Specifically, I would like for the court to stipulate that page 1 of O. Staab's write-up be stricken from the record because 8 counts of perjury demonstrates that her testimony can not be trusted. Additionally, the Prosecution failed to turn over an AVR covering that period of time which could be used to verify or dispute her testimony.

According to Intentional Spoilage of Evidence standards; the party that is innocent of spoiling evidence is to receive all credibility because the act of intentionally destroying evidence in and of itself implies that the evidence destroyed was most likely to be of a nature beneficial to the opponent. Officers Staab and Copeland are obviously engaging in perjury because their lies consistently characterize the defendant negatively and thus are not merely coincidental or un-intentional.

I am unable to prove that O. Tuxhorn committed perjury in his statement. According to my 7/05 pre-indictment statement, several law enforcement officers were on top of me during the portion of the struggle while I was lying face down on the ground. Because the majority of my body appears to be off screen during that time I can not prove that he and another officer arrived on-scene earlier than they admit to. Additionally, I have already mentioned the fact that the pattern of characterizing a person's actions as belligerent enables the officers to have taken whatever abusive actions they wish and escape without ramifications. I can only once again remind the court of the fact that my statement was tendered to people long before I had an opportunity to review the prosecution's evidence. Additionally, evidence exists which is extremely suggestive of someone having tampered with the AVR evidence. Finally, the defendant has tendered to the court several photographs of injuries sustained by her during the struggle. Bruises can be clearly noted on the defendant's shoulders, bilaterally on her ribs, and on her back. The bruises on her body bear testimony supportive of the testimony she gave in her statement. Though the defendant can not absolutely prove O. Tuxhorn is not being entirely truthful regarding the time of his arrival and the immediate actions he took thereupon, there exists at least some evidence that bears her out. Since there is no AVR with which to compare his statement; I will not comment on it further.

Perjury #19. (All OFFICERS). Not one officer present at the scene makes any mention of the fact that my vehicle's panic alarm system was activated. Yet, per the AVR I can absolutely confirm that it was activated at least for a brief period of time. Additionally, I have attached certification from my automobile's

manufacturer/servicer which demonstrates that the vehicle's panic alarm system was in "perfect working condition" on 7/1/05. (Exhibit 0015 & 0016).The documentation verifies that the panic alarm system was a factory installed feature, that they have never serviced the panic alarm system even though they have performed all routine maintenance on my vehicle, and that the alarm was inspected by them and found to be in "perfect working condition during that inspection which took place 8/06. Therefore, it was absolutely functioning properly 7/1/05. It was absolutely heard, and the failure of even one officer to mention the occurrence is at best highly suspicious. this is perjury by omission-- an intentional withholding of potentially exculpatory information from the jury. The Officers are required to report the incident(s) fairly and accurately regardless of whether they agree with the conclusions that such evidence implies. The Officers' omission of any mention of the vehicle's panic alarm system activation is indicative of an intentional distortion of the events. It also violates the Defendant's compulsory right to exculpatory evidence under the U.S. Constitution. Finally, the defendant alleges that the State of Illinois would not have been able to prosecute her at all; had they not gone into the secret back room of the Crime Lab and doctored up the tape. I have heard of Officers & Prosecutors tampering with evidence because they believe someone is guilty and they want to, "help Justice along." This is despicable and abhorrent to me. However, I have never before heard of Officers & Prosecutors tampering with evidence in an effort to knowingly convict an innocent person of a crime who happens to be a single parent and send her to prison for the remainder of her daughter's childhood. There is no word in the English language that can adequately describe how I feel about this dastardly deed. I feel like I have been dealing with some kind of Thug or Drug Czar and I've only been dealing with my State Government. Absolutely everyone involved with this case should be placed under the prison!

A Denial of Due Process exists in that the State of IL. prosecuted the defendant with tainted evidence. Overwhelming evidence exists to suggest that the AVR was subjected to multiple surreptitious modifications by an un-known person(s) before it was tendered to the court. Additionally, the fact that the Officers fail to mention the vehicle's panic alarm firing and their vehement characterization of the defendant's behavior as belligerent are suggestive of the fact that they knew the AVR would be modified to fit that version. In other words, the modification of the AVR and the Officers' characterization of the defendant as belligerent are suggestive of the existence of a Conspiracy to cover-up the violation of the defendant's rights.

A Denial of Due Process Exists because an overwhelming number of anomalies that are often indicative of evidence tampering exist on the AVR used to prosecute the defendant. Each one is reason to call in an expert authenticator in and of itself-- particularly in view of the totality of the circumstances surrounding this case. That such questionable evidence was used to prosecute the defendant is an absolute shame. At this point, it is not the defendant's intention to have the AVR thrown out of court. On the contrary, the defendant's intent is to transform the AVR into her best evidence under the Intentional Spoilage of Evidence procedural guidelines. The AVR shows the following 23 signs of potential tampering. The defendant seeks a court order requiring the State of IL to attempt to have the version of the AVR that was used to prosecute her authenticated at a mutually agreeable Commercial (non- law enforcement) facility rendering expert authentication at State expense. If the state is unable to authenticate the AVR used to prosecute the defendant; intentional spoilage of Evidence Rules automatically apply and the judgment entered with regard to the case is to be one favorable to the party not involved in the spoilage.

According to expert authenticators, the following conditions may represent just cause for a tape to be evaluated for signs of tampering:

Per attachment: (Tom Owen Audio/Video Authentication & Enhancement
*Note scene changes, split fields, motion Blur, and other anomalies
*Note audio and time code track analysis
*Check evidence tape for discontinuities such as deletions, insertions, over-recordings, stops and starts.

Per Steve Cain's article, The Forensic Examination of Video Tape-- Technical, Integrity and Legal Issues page 3, par. 5, "Both of these types of simple editing can result in errors including timing, phase and

synchronization problems which would produce glitches, smears, rolls, or other artifacts consistent with consumer-type editing…"

The defendant asserts that the Court should order the attempted authentication of the AVR because due to the following circumstances:

Anomaly #1.  The condition of the VHS cartridge upon receipt of the tape was questionable.  It appeared well used as if it had been recorded upon repeatedly.  Additionally, it was very labor- intensive to watch in that you would have to repeatedly press play seemingly every 40 seconds to a minute or so.  Thus, it was impossible to gain any sense of continuity when attempting to view the recording in order to glean information from it.  I was never able to view the complete tape in it's entirety during the period of time in which I was being prosecuted.  I tried several times to watch it and eventually gave up.  My attorney basically said that since I was observed kicking on tape there wasn't any hope for my assertions-- particularly with such scathing written reports having come from the officers.  Each time I attempted to review the tape I was unable to absolutely confirm that my vehicle's panic alarm lights were indeed going off.  Since I was never able to reasonably assure myself of the fact that I could prove to others that they were going off; I abandoned my attempts to prove my innocence.  In Aug 2006. I resumed my intentions to clear my name and attempt to prove what really happened to me.  That month, I had an epiphany.  As a result, I realized that I could have a commercial videograper transfer the tape to another cartridge so that I could fully view it.  Once that was done, I was able to confirm the fact that my vehicle's panic alarm does indeed go off.  In addition, for the first time, I realized that I had been unable to isolate the information previously because a substantial portion of the lights have most likely been removed from the AVR.  I began to conduct research to discover what kinds of things to look for in order to raise suspicion of evidence tampering.  As a result, I discovered that one situation which might raise suspicion is the presence of an obstruction that prevents viewing of the tape.  I strongly believe that I was unable to successfully view the tape in it's entirety because the prosecution team did not wish for me to be able to do so.  I believe that whomever surreptitiously edited the AVR evidence also set up an obstruction to viewing in order to impede my attempts to develop my criminal defense.  Exhibit 0030 Page 7, Paragraph 3 labeled "5.1.1.2  Operating Condition."  It states, "When the tape recorded evidence is contained in a cassette, the cassette shall be carefully examined to determine that it is operable.  The FTA shall inspect the cassette, making sure that there is no obstruction to the tape."  It goes on to state, "The FTA shall carefully rotate the tape hubs in both directions to detect any hidden obstruction that could hinder playback. "  After I transferred the tape to another cartridge, I was able to clearly see that the vast majority of the firing of the vehicle's panic alarm lights had been removed from the tape.  That discovery  specifically caused me to start researching the issue of fabrication.  As a result, I came to understand that the obstruction to viewing had been most likely been deliberately placed therein.

Anomaly #2. The sounds we hear (and don't hear on the AVR) don't correspond to the imperical knowledge that we have regarding how sounds act.  Specifically, on this particular recording we have several instances where we hear one sound and yet we are unable to hear another sound of equal or greater sound intensity (as measured in deciBels) which is occurring at an approximately equal distance from the microphone or audio recording device.

WHAT WE HEAR/DON'T HEAR ON TAPE

We hear O. Staab's apparent normal conversation with Lt. Copeland (40- 60/70 dB) in frames 23-29-26 thru 23-29-32.

We hear O. Staab yelling at me inquiring as to whether I was refusing to obey an officer (90 dB), frames 23-30-24 thru 23-30-26.

We are unable to hear most of my response but do hear the word, "Bitch" (90 dB) in frames 23-30-37 thru 23-30-39.

We don't hear me screaming during the struggle though by all accounts (arresting officers' and mine) I was

Appeal 12

screaming something (90 dB) frames 23-30-53 thru 23-31-22.

We don't hear my vehicle's panic alarm (horn) going off (110 dB) though the film verifies that it did and I have attached verification that it would have been in perfect working condition 7/1/05.

We don't hear the  normal conversation between the 2 law enforcement personnel standing directly in front of the vehicle (40- 60 dB) -- unknown frame numbers.  Situation takes place after the arrival of the Jerome patrol car and during the time we see Officer Tuxhorn apparently arriving for a suspicious second time.

We don't hear the sounds of passing traffic which are approx. 90 dB on a busy street though there are vehicles apparently passing by throughout the duration of the AVR.  The sounds of each passing vehicle would be approximately as loud as Officer Staab's shouting (90 deciBels) and yet we don't hear a single one passing.

*** Notice that when I was screaming at Officer Staab I was standing in almost the exact same spot she had been standing in when she yelled at me, "Are you refusing to obey a police officer?"  Additionally, the bladder that emits the sounding of a vehicle's horn is mounted very near the steering column of the vehicle under the hood.  Vehicle horns have a normative deciBel value of 110 dB.  Every increase of 10 deciBels results in a sound that is interpreted by the human ear as being approximately twice as loud as the previous sound (Exhibits 0017thru 0025).  As a result, the vehicle's horn would have been interpreted as being 4 times as loud as the sound of O. Staab's shouts and mine and yet the horn of the panic alarm isn't heard.

*THE FINAL CONCLUSION IS THAT THERE IS SEEMINGLY NO RHYME NOR REASON FOR THE PRESENCE OR ABSENCE OF SOUNDS THAT ARE HEARD ON THIS AVR.  SEEMINGLY, THE ONLY EXPLANATION THAT MAKES SENSE IS THAT WE ARE ABLE TO HEAR THE SOUNDS THAT THE PROSECUTION WANTS US TO HEAR AND NO OTHERS.
Per (Exhibit 0031, Page 3, Par. 7), "Using audio dubbing technology, it is possible to completely rearrange words, sounds, and sentences or to produce audio segments with unintended, opposite, and legally detrimental meanings. Audible signs that may reflect editing would include significant changes in volume, content, or continuity with either the main speaker's words or background sounds, sudden or strange sounds, and the audible component not fully synchronized with the relevant video picture."
Additionally, per (Exhibit 0026 page 2,  par. 1), "Original recordings should contain all of the audio information recorded at the moment in time that the event occurred."


Anomaly #3.  The presence or absence of sounds on this AVR are not explained by any of the pure forms of Recording Device Malfunctions.  We will now briefly look at the pure forms of mechanical malfunction that could exist and why the presence or absence of the sounds can not be explained by any pure form of mechanical failure.  The word "MIC" appears at the top of the screen-- apparently whenever O. Staab is talking.  It is seen flashing and may indicate some kind of malfunction with the microphone or recording device.  It appears this may be a reason the State is offering up to excuse or explain the absence of sound during the majority of the tape.  A review of the 4 basic equipment failure scenarios appears to reveal evidence of tampering/selective sound manipulation.

SCENARIO 1.  Both recording devices work.  This assumes O. Staab has a microphone recording device that records directly onto the patrol car's audiovisual recorder. It also assumes the patrol car has a recording device as well and both are functioning properly.  In this scenario, we should be able to hear all sounds that occur.

The sounds that are present on the AVR deviate from the expected values because there are several sounds of a relatively high dB value that are not heard ( 1. most of what I say when screaming at O. Staab, my vehicle's panic alarm horn, the sounds of passing vehicles).

SCENARIO 1 FAILS TO ACCOUNT FOR THE PRESENCE OR ABSENCE OF SOUNDS NOTED ON THE AVR.

SCENARIO 2. Neither recording devices work. This assumes that both O. Staab's recording device and the patrol car's are non-functional. In this scenario we should be unable to hear any sound whatsoever.

The sounds that are present on the AVR deviate from the expected values because there are several sounds that we do hear. We hear O. Staab's conversation with O. Copeland. We hear O. Staab yelling her inquiry at me regarding whether I was refusing to obey a police officer. We hear O. Staab yelling for another unit. We hear me say the word, "Bitch".

SCENARIO 2 FAILS TO ACCOUNT FOR THE PRESENCE OR ABSENCE OF SOUNDS NOTED ON THE AVR.

SCENARIO 3. Officer Staab's microphone is working but the vehicle's recording device is not. In this scenario, we would expect to hear everything O. Staab has to say, but nothing else.
This scenario is most closely associated with what we actually find on the AVR. However, even this scenario fails to account for the absence or presence of all sounds on the AVR. Notice that I am overheard saying the word, "Bitch." It happens as follows:

23-30-24 thru 23-30-26 O. Staab asks, "Are you refusing to obey a police officer?
23-30-28 Picture drops out.
23-30-30 thru 23-30-31 Picture comes back in and O. Staab is overheard stating, "That's fine. I'm gonna call" * Her Mic is flashing above her but the sound of her voice immediately drops out. O. Staab has turned around and is walking away from me.
23-30-37 thru 23-30-39 the word "MIC" is seen mysteriously flashing at the top of the screen and we hear me saying the word, "Bitch". Her microphone failed to pick up the end of her sentence but yet it is able to record my saying an extremely ugly word seconds later. To add insult to injury; her microphone fails to capture the remainder of my sentence despite the fact that she turns around to face me-- moving the mic even closer to me than it was when it initially picked me up. The sound of the "B" sounds a bit muted-- as if someone tried to separate the word from one that immediately preceded it (Stop & Start edit). Note that such a scenario would fit with my assertion that when I exited the vehicle I shouted, "You lying, fucking Bitch... etc."

AT ANY RATE, SCENARIO 3 FAILS TO ACCOUNT FOR THE COMPLETE ABSENCE OR PRESENCE OF SOUNDS AS WELL.

SCENARIO 4. The vehicle's recording device is working but O. Staab's is not. Two possible outcomes exist for this scenario. In the first, we would hear everything except for O. Staab. In the second, we would hear everything including O. Staab so long as she is standing sufficiently close to the vehicle's recording device in order to be picked up.

The sounds that are present on the AVR deviate from the expected values because there are several sounds that we are unable to hear which should be heard. Such sounds include the screaming I did when I stood in the identical space from which O. Staab had shouted from just moments beforehand. The sound of my vehicle's panic alarm horn should be heard. If we hear the normal conversation in which O. Staab appears to be talking to O. Copeland; then we should hear the one being conducted between the 2 law enforcement personnel standing directly in front of the patrol vehicle. Additionally, we fail to hear me screaming anything during the struggle that occurred directly behind my vehicle. By all accounts, I was screaming but I can not be heard. On the other hand, O. Staab is heard loudly and clearly when she radios for, "another unit" 23-31-09.

SCENARIO 4 FAILS TO ACCOUNT FOR THE ABSENCE OR PRESENCE OF THE SOUNDS HEARD ON THE AVR.

*Appeal 14*

Again, Per (Exhibit 0026, page 2, par. 1),"Original recordings should contain all of the audio information recorded at the moment in time that the event occurred.  IN CONCLUSION, NONE OF THE 4 POSSIBLE SCENARIOS IS ABLE TO ADEQUATELY ACCOUNT FOR THE PRESENCE OR ABSENCE OF SOUND ON THE AVR USED TO PROSECUTE THE DEFENDANT.  ONLY 2 OTHER POSSIBILITIES EXIST.  THE FIRST BEING THE PRESENCE OF SELECTIVE SOUND MANIPULATION/EVIDENCE TAMPERING.  THE SECOND POTENTIAL EXPLANATION WOULD BE ONE OF A COMBINATION OF EQUIPMENT FAILURES WITH BOTH RECORDING DEVICES COMING INTO AND OUT OF FUNCTIONING ORDER.  THE SECOND POSSIBLE EXPLANATION IS UNLIKELY BECAUSE THE STATE OF IL HAD AN APPROXIMATE $24 BILLION BUDGET FOR FY 2005.  ADDITIONALLY, MANY OTHER POTENTIAL INDICATORS OF TAMPERING ARE PRESENT ON THE AVR. THE SHEER MULTITUDE OF THE ANOMALITIES AND THE FACT THAT SOME OF THEM ARE EXTREMELY APPARENT STRONGLY SUGGESTS THAT TAMPERING HAS OCCURRED.  THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATES THAT MULTIPLE SURREPTITIOUS EDITS HAVE BEEN PERFORMED ON THE AVR USED TO PROSECUTE THE DEFENDANT.

Again, Per (Exhibit 0031, Page 3, Par. 7), "Using audio dubbing technology, it is possible to completely rearrange words, sounds, and sentences or to produce audio segments with unintended, opposite, and legally detrimental meanings.  Audible signs that may reflect editing would include significant changes in volume, content, or continuity with either the main speaker's words or background sounds, sudden or strange sounds, and the audible component not fully synchronized with the relevant video picture."


Anomaly #4.  The duration of the various lights (Red, Yellow, Green) on the traffic control device which is seen in approximately the rear middle portion of the AVR screen seem to be of too short a time frame for the speed limit associated with that stretch of road (40- 45 mph or so).  That traffic control device completes approximately 21 complete light cycles in the 19 minutes and 14 seconds' worth of time represented on the AVR.  Assuming  that one complete light sequence (onset of one red light to onset of the following red light) might last for approximately 4 minutes; then we would calculate that 19.41 is time for approximately 4.8525 complete light sequences to have occurred.  We have nearly 5 times that amount.  We have 21 complete light cycles occurring in 19.41 minutes.    I anticipated that one possible objection that the Prosecution might have to my timing of the lights is to state that the AVR does not exactly correspond to time as it occurs in real life.  In other words, 30 seconds on a VHS tape doesn't necessarily correlate to 30 seconds as experienced in real time.  To counter that argument, I purchased a new stop watch calibrated to the nearest 100th of a minute in September.  I taped from frame 11-30-30 to 11-35-30. My stop watch came up to approx. 4 minutes and 47 seconds or just short of the expected 5 minutes.  Thus, the time that elapses on the VHS recording closely approximates that which is occurring in real-time.  I do have documentation from IDOT showing that it is possible for a green light might last for be of less than one minute's duration for that particular traffic control signal.  However, the same documentation states that the traffic signal rests in green post approximately 9pm on Friday evenings.  Thus, any duration of less than one minute's duration would have to be triggered by cross traffic demand.  I have timed the light at that intersection on  numerous occasions and have found times in excess of 3-6 minutes to be the normal duration for the green light.  In fact, I have not seen that light have a duration of less than 3 minutes on any of a number of excursions that I have taken to that site to time it or monitor it's function.

The average temporal values for the lights viewed in this AVR are as follows:

Red light 22 seconds
Green light 20 second
Yellow light 4 seconds

The complete listing of the duration of the lights as viewed on film are as follows:

| R 23-30-31 | ? | G 23-30-37 | 38sec | Y 23-31-15 | 4 sec |
| R 23-31-19 | 17 sec | G 23-31-36 | 29 sec | Y 23-32-05 | 4 sec |
| R 23-32-09 | 17 sec | G 23-32-26 | 24 sec | Y 23-33-50 | 4 sec |

*Appeal 15*

| | | | | | |
|---|---|---|---|---|---|
| R 23-33-54 | 17 sec | G 23-33-11 | 25 sec | Y 23-33-36 | 4 sec |
| R 23-33-40 | 17 sec | G 23-33-57 | 32 sec | Y 23-34-29 | 4 sec |
| | | | | | |
| R 23-34-33 | 28 sec | G 23-35-01 | 41 sec | Y 23-35-42 | 3 sec |
| R 23-35-45 | 17 sec | G 23-36-02 | 28 sec | Y 23-36-30 | 4 sec |
| R 23-36-34 | 16 sec | G 23-36-50 | 26 sec | Y 23-37-16 | 4 sec |
| R 23-37-19 | 17 sec | G 23-37-36 | 33 sec | Y 23-38-09 | 4 sec |
| R 23-38-13 | 27 sec | G 23-38-70 | 27 sec | Y 23-39-09 | 4 sec |
| | | | | | |
| R 23-39-13 | 17 sec | G 23-39-30 | 25 sec | Y 23-39-55 | 4 sec |
| R 23-39-59 | 17 sec | G 23-40-16 | 31 sec | Y 23-40-47 | 4 sec |
| R 23-40-51 | 17 sec | G 23-41-08 | 38 sec | Y 23-41-46 | 4 sec |
| R 23-41-50 | 17 sec | G 23-42-07 | 30 sec | Y 23-42-37 | 4 sec |
| R 23-42-41 | 20 sec | G 23-43-01 | 22 sec | Y 23-43-23 | 4 sec |
| | | | | | |
| R 23-43-27 | 16 sec | G 23-43-43 | 25 sec | Y 23-44-08 | 5 sec |
| R 23-44-13 | 16 sec | G 23-44-29 | 32 sec | Y 23-45-01 | 4 sec |
| R 23-45-05 | 17 sec | G 23-45-22 | 35 sec | Y 23-45-57 | 5 sec |
| R 23-46-02 | 29 sec | G 23-46-31 | 25 sec? | Y 23-46-56 | 4 sec? |
| R 23-47-00 | 16 sec? | G 23-47-16 | 33 sec | Y 23-47-49 | 4 sec |
| | | | | | |
| R 23-47-53 | 17 sec | G 23-48-10 | 39 sec | Y 23-48-49 | 5 sec |
| R 23-48-54 | 27 sec | G 23-49-21 | 24 sec | | |

\* Tape ends @ 23-49-45.

Notations.
1. Panic alarm goes off on vehicle apparently right around one green light from 23-31-24 thru 23-31-27 and 23-31-47 thru 23-31-48. This appears to indicate a possible splice and a deliberate attempt to place the 2 sequences close together when spliced in order to be able to assert that the panic alarm didn't sound for very long. Thus, even if I was able to isolate the few frames during which the lights could be seen the Prosecution would be able to assert that the occurrence was insignificant.
2. There is a section of film denoted as the CHANGING OF THE GUARD GLITCH in which a smaller man morphs into a larger one. This occurs at 23-32-39 thru 23-32-40 (little guy is seen) and 23-32-40 thru 23-30-41 (larger guy is seen). See Anomaly #8.
3. With regard to the Green light that begins in frame 23-35-04, there is a man standing in front of the light for a period of time. The light appears to still be green when he leaves (23-35-28).
4. O. Copeland leaves the screen on 23-31-36 thru 23-31-37. There appears to be a bit of an odd glitch when he leaves. It appears that both he and my leg exit the screen and then my leg is seen rapidly falling back on-screen. There's something that seems a bit unnatural about the way my foot re-enters the screen though I can't quite explain what it is.
5. I had to estimate the temporal values pertaining to the duration of a few lights because there was a patrol car in front of the traffic control device for a while. However, it was fairly easy to estimate their values based upon the values of the lights I had seen. I held the value of the Green light who's onset is @ 23-46-31 at 25 seconds, gave the subsequent yellow light a value of 4 seconds, and then assumed the value for the subsequent red light to be 16 seconds. Each of the assigned values is relatively consistent with the values that have held fairly constant throughout the AVR.

The values for the Red light were Unknown (2 times), 17 seconds (12 times), 28 seconds (once), 16 seconds (3), 27 seconds (twice), 20 seconds (once), and 29 seconds (once) for an average value of 22 seconds.

Appeal 16

The values for the Green light were: 16 sec (1), 22 sec (1), 24 sec (1), 25 sec (3), 26 sec thru 31 sec (once each) 32 seconds (2), 33 sec (1), 38 sec (2), 39 sec (1) and 41 sec (once) for a total average of 20 seconds.

The values for the yellow lights were consistent at 4 sec (15 times), 5 seconds (once) and an unknown value (once) for an average of 4 seconds.

*The entire listing of values seems most unusual. I haven't ever heard of green or red lights averaging some 20 odd seconds each-- particularly on a stretch of road with such a rapid rate of allowable speed. Additionally, the right bottom portion of the screen where the action is occurring between the defendant and the officers is noticeably brighter than the portion to the left where the cars are traveling. This may be indicative of the use of a split screen and/or time- lapse photography on the left portion of the AVR. See Exhibit 0028.

Anomaly #5. The defendant also will mention again that information received from IDOT states that late at night the northbound and southbound lights rest in green and only change color when cross traffic is detected. (Exhibit 0089). However, in the Audiovisual recording used to prosecute the defendant there appear to be a number of instances where the northbound light changes from green in the apparent absence of any noted cross traffic demands-- namely frames 23-31-16, 23-32-11, 23-32-54, 23-33-44, and 23-38-13.

Anomaly 6. The tape counter/clock in the lower right quadrant of the AVR is not working correctly and yet it seems to be keeping fairly accurate time in aggregate. In other words, the total amount of time that elapses from the time the tape opens until the time it closes appears to be fairly accurate. However, there are noticeable and unexplained drops from one number to another number that is 2- 4 minutes away from it. There is no rhyme nor reason for these lapses and they are suggestive of the tape having been intentionally altered by some unknown individual.

I began recording the duration of the light sequences (see above) at 23-30-31 per the SOS tape in the upper right quadrant of the AVR. I started at that time in order to avoid many of the picture dropouts, & other technical difficulties associated with the very early portion of the tape. I finished monitoring the duration of the light sequences at 23-49-45 which is when the tape ends. Thus, the monitoring of the light sequences reflects a total of 19 min 14 seconds worth of time. The tape actually opens at 23-27-32 and that is the point at which I started monitoring the changing of the tape counter/clock registered at the bottom right of the AVR. From 23-27-32 until the end of the tape (23-49-45) is a total of 22 min & 13 seconds. Therefore, the total tape lasts for 2 minutes and 59 seconds longer than the amount of time that is accounted for on the light analysis information listed above.

However, the counter/clock (lower right quadrant of the tape) in aggregate accounts for some 28 minutes. This device is apparently counting backwards and thus appears to be perhaps counting out the amount of recording time that remains available on that particular tape. The values associated with this device were compared to the time that was showing on the SOS tape when each number/time appears. The recorded values associated with this device are as follows:

| SOS Counter | Counter/Clock | |
|---|---|---|
| 23-27-32 | 4:43 | |

* Picture drop out several seconds.

| 23-28-58 | 4:43 | |
|---|---|---|
| 23-29-17 | 4:40 | *clock drops several minutes to 4:40 in one frame |
| 23-29-29 | 4:39 | |

23-29-39 or so picture drops out again.

| 23-29-45 | 4:39 showing on very distorted picture. | |
|---|---|---|

23-30-10 picture drops out again.

23-30-18 *Only SOS clock showing thru frame 23-30-22

| | | |
|---|---|---|
| 23-30-22 | | 4:39 appears to still be on the clock. There is an instantaneous complete Picture drop out and the same information re-appears. |
| 23-30-43 | 4:39 still on clock. | |
| 23-30-50 | 4:38 | |
| 23-31-14 | 4:37 | |
| 23-31-46 | 4:36 | |
| 23-33-00 | 4:35 | |
| 23-33-13 | 4:34 | |
| 23-35-25 | 4:32 | *Clock drops directly from 4:34 to 4:32 @ 23-35-25. |
| 23-35-38 | 4:31 | |
| 23-36-54 | 4:30 | |
| 23-37-33 | 4:29 | |
| 23-38-25 | 4:28 | |
| 23-39-35 | 4:26 | *Clock drops directly from 4:28 to 4:26 @ 23-39-35. |
| 23-40-46 | 4:25 | |
| 23-41-25 | 4:24 | |
| 23-43-30 | 4:21 | *Clock drops directly from 4:24 to 4:21 @ 23-43-30. |
| 23-44-16 | 4:20 | |
| 23-46-09 | 4:18 | |
| 23-47-29 | 4:16 | *Clock drops directly from 4:18 to 4:16 @ 23-47-29. |
| 23-48-37 | 4:15 | |

TAPE ENDS AT 4:15 AND FRAME 23-49-45.

IN CONCLUSION, THE FUNCTIONING OF THIS CLOCK/COUNTER IS PARTICULARLY TROUBLING. IT'S FUNCTIONING ABSOLUTELY SUGGESTS THAT SOME UNKNOWN PERSON TAMPERED WITH THE AVR USED TO PROSECUTE THE DEFENDANT. NOTICE THERE ARE SEVERAL TIMES WHEN THE CLOCK DROPS SEVERAL MINUTES AT A TIME. IF THE CLOCK WERE TRULY FUNCTIONING IN SUCH A MANNER THAN ONE WOULD EXPECT THAT IT WOULD BE COMPLETELY OFF FROM WHAT THE SOS CLOCK SAYS. THIS CLOCK SPONTANEOUSLY DROPS 2-3 MINUTES FOR NO RHYME NOR REASON. WITH SUCH FUNCTIONING WE WOULD EXPECT ABSOLUTELY NO CORRELATION TO THE SOS CLOCK . YET, IN AGGREGATE THIS CLOCK SEEMS TO BE ONLY 5 MINUTES AND 47 SECONDS OFF WHEN COMPARED TO THE SOS CLOCK. THE SOS CLOCK SHOWS THE RECORDING TO BE SOME 22 MINUTES AND 13 SECONDS. THE COUNTER/CLOCK SHOWS THE RECORDING TO LAST APPROX. 28 MINUTES (4:43 START TIME MINUS END TIME 4:15 EQUALS 28 MINUTES.) THE DIFFERENCE BETWEEN THE TOTAL ELAPSED TIMES ARE 28 MINUTES (COUNTER/CLOCK) MINUS 22 MIN. 13 SECONDS (SOS CLOCK) EQUALS A DIFFERENCE OF 5 MIN. 47 SEC.

* HOW CAN A CLOCK SPONTANEOUSLY LOSE A TOTAL OF 12 MINUTES' WORTH OF TIME AND END UP BEING ONLY 5 MIN 47 SEC AWAY FROM THE ACTUAL TIME?

There are 2 other noticeable trends with regard to the functioning of this clock that are indicative of evidence tampering. The first of these is that there is seemingly no correlation with regard to the numbers that are dropped. For instance, if every time the digit for the 1 minute space is supposed to be a 3 and the 3 malfunctions; it would malfunction every time. In this taped sequence you will have the one-minute digit for the number 2 or 3 having been skipped but then it shows up later. The best way to illustrate this is to compare the 2 times the clock drops by 3 minutes. In the first, the clock drops from 4:43 straight to

4:40. We might think that perhaps the one-minute digits for the 1 and for the 2 don't work and that is why we don't see times 4:42 & 4:41. However, this doesn't hold true because the one-minute digit for the 1 does in-fact show up in the second malfunction that displays the disappearance of 3 minutes. When the clock drops from 4:24 to 4:21 we are able to see the #1. Also, the #3 was working in the One's place for the time 4:43 but in the second malfunction it's skipped because there's no (4:23). Therefore, the malfunctioning can't be contributed to a malfunctioning of a any one's digit number. Time and time again, on the analysis listed above we see an instance where a one's digit number is missing for one time and present on another. Thus, a malfunction isn't the issue.

Apparently, the issue appears to be that the skips are intentionally selected numbers. The best example is that the type of digit used on this counter has certain digits that can easily be changed to another digit. The clock uses a rounded out number 8. Therefore, if we simply erase the upper right portion of the number 8 it easily becomes a number 6. This appears to be the reasoning that is used on the tape. In the case of the drop from 4:24 to 4:21 we are simply losing one bent line. It appears that someone selected digits that can be easily changed to another and then manipulated them. The assumption was most likely that if the changes in the numbers were kept subtle they would not be noticed on a tape of such obviously poor quality and would thus be easily overlooked.

ANOMALY 7. There are several times when a second (SOS) clock can be seen immediately above the perpetual SOS clock showing exactly the same time that is being shown on the SOS clock. The second clock appears for only a brief second and disappears. This anomaly occurs several times on the AVR recording. It occurs in frames 23-29-00, 23-29-17, 23-29-22, 23-29-25,23-30-51, and 23-32-07. This appears to be an artifact and could easily be associated with someone attempting to overlay two different pictures in order to splice them together and simply forgetting to erase the second clock. This anomaly is more readily noticeable on the CD version of the AVR.

ANOMALY 8. CHANGING OF THE GUARD GLITCH. There is a section of frame in which one person apparently exchanges places with another person. However, the entire sequence is a bit odd. In frame 23-32-39 thru 40 there is a gentleman standing to the far right of the screen of the AVR and facing outward. He appears to have on light colored clothing-- possibly beige or White. He has a sports shirt and pants on. In the blink of an eye he disappears and a new guy emerges who is a full head taller than the first one. The second one is dressed in a police uniform with an apparent stripe down the middle portion of the leg and is wearing a belt. He appears in 23-32-40 to 41. His emergence is completely without reason and odd. When he comes on screen he is seen apparently walking through the first guy. He steps over me and stands there a moment. Then, he simply makes an approx. 180 degree turn and heads virtually back in the general direction from whence he came. He was apparently in such a hurry to go there and stand over me that he walks THROUGH someone else-- only to do absolutely nothing while he stands there and then to finally head back to the area from whence he came. Additionally, he could have easily passed by the left or the right in order to get to exactly the same place. He was in a hurry to get there & thus passes through the first guy's space when nothing was happening there in the first place. Obviously, this is a glitch. They apparently needed to splice 2 different sections of tape together and this was their best or only means of doing so. Thus, they simply exchange one person for another and hope that the viewer won't happen to notice. This glitch is more readily apparent on the VHS version of the AVR than it is on the CD recorded version for whatever reason.

ANOMALY 9. In frame 23-32-11 the letters Br flash across the screen quickly in the field immediately to the right of the "Sec. of State 7/1/05" date stamp. It is clearly visible in the top middle portion of the screen. It appears only for a moment and then disappears. It's meaning is unclear and it could easily be an Artifact that someone failed to erase when they spliced 2 portions of film together. It may indicate a unit number of some other form of identifier that appeared on a section of tape from a different department's recorder which was spliced into the original SOS tape.

ANOMALY 10. Evidence exists which suggests the presence of over-taping. In frames 23-29-26 thru 23-

29-32 O. Staab's voice is overheard.  In the few frames preceding that one she was seen walking past the front of the patrol car toward the right and then she disappeared off screen.  Her voice is heard apparently talking with the newly arriving O. Copeland.    She is overheard saying, "She refuses to give me her license, she refuses to get out of the car.  She's gonna go for obstruction when I get her out of the car. "  That O. Copeland is not overheard answering her is noteworthy.  Additionally there was a picture drop out a few frames before her statement and one occurs after it.  This situation may be valid or it may represent an over-taping type of edit.  The fact that O. Copeland isn't heard answering her and the fact that neither is seen on-screen may reflect that he simply nodded his head instead of verbally answering her or the entire sequence could have been recorded in Pocoima, CA.  The only way of knowing for certain whether this is an insert edit is to have the tape professionally authenticated.  (Exhibit 0026 page 2 paragraph  3 specifically mentions the modification of an AVR by such means stating, "Lastly, synthesis is the generation of artificial text by adding background sounds or conversation to the taped copy which were not present on the original recording").  The defendant notes that at least one Expert Authentication source specifically mentioned that if person(s) are apparently talking but we only see the back of their heads that could serve as a possible sign that fabrication has occurred.  The defendant asserts that this is even a greater possibility when the persons who are allegedly speaking aren't even viewed in the video portion of the recording!

Anomaly #11. There are a number of complete picture drop-outs.  In and of themselves, they don't demonstrate or verify very much.  However, taken in totality they occur in such sufficient numbers that they do raise the question of whether or not the entire video is contiguous.  Per (Exhibit 0026, Page 2, Paragraph 1), "On a more practical level, an original recording is considered authentic if it starts at the beginning of the tape and does not stop until the end.  Any stops or restarts should be announced by the operator.  Original recordings should contain all of the audio information recorded at the moment in time that the event occurred.  The recording should further not contain any break in it's continuity or content nor should it contain any suspicious signs suggestive of falsification."  As a result, the significant number of complete and partial picture dropouts that are seen on the AVR used to prosecute me are problematic-- to say the least.

Anomaly#12 The entire videotape contains quite a bit of "fuzz" or static which continues throughout the entire duration of the videotape.  Likewise, there are a number of times when the picture appears blurry-- or smeared; particularly during the struggle.  Per (Exhibit 0031, Page 3, Par. 5) states, "Both  of these types of simple editing can result in errors including timing phase and synchronization problems which would produce glitches, smears, rolls, or other artifacts consistent with consumer-type editing."  Again, the anomalies should be investigated by an expert authenticator.

Anomaly #13 The defendant has noticed that the central area of the video recording that lies directly behind her car appears to contain the presence of "pixel-type" boxes.  Their presence can be visually detected both on the VHS and CD recordings of the incident.  However, their presence appears more pronounced on the CD version of the recording.  The presence of those boxes in that immediate area is troublesome to the defendant because that immediate area is primarily where the majority of the important acts occur and the defendant believes the visual presence of those boxes indicates a strong probability that her AVR was tampered with.  She believes the blurry/fuzzy nature of the entire video recording is further indicative of this because the static was most likely used to obscure the presence of the pixel-type boxes.  Per (Exhibit 0026, Page 4, Par. 4), "There are at least 30 different desktop computer editing workstation or digital recorders which can be used as 'turnkey' editing systems.  Software and add on computer cards can transform an IBM or Macintosh computer into sophisticated digital audio editing machine. "

Anomaly #14.  There appears to be a deliberate attempt to obscure the color of various items, particularly the color of the clothing that people have on.  This is appears most obvious or pronounced during the time frame between the end of my struggle with Officers Staab & Copeland and the arrival of a Jerome patrol car.  There is a point at which the Intern walks over to the right of the screen.  As he is doing so we see that he appears to have on a white shirt and blue denim jeans.  Once he gets to the far right of the screen the colors become obscured.  The defendant believes the color obscuration to be intentional because the colors

Appeal 20

become quite easily distinguishable again later in the video. She believes the obscuration of color aided the fabricators to exchange law enforcement personnel for one another without detection (ie to provide near seamless transitions for their splices). Two such examples follow.

Example 1.

23-33-02 An Officer is seen standing over me. He puts on gloves, and then kneels over me. He appears to have on dark green pants.
23-34-02 The man backing out of the picture appears to have on beige uniform pants. Did he change clothes while he was there?

Example 2.
23-33-58 When the intern moves, we see a uniformed man standing up wearing dark green pants.
2333-59 We see the back of a man but now the uniform pants appear to be beige and not green.

Per Exhibit 0031 specifically mentions the fact that color aberrations may exist and/or be indicative of a tampering attempt. (Page 4, Par. 4) states, "If the camcorder is available for inspection, additional video analyzing devices allow for measurement of deficiencies in the camera's video signals, (luminance, and chrominance) and also color aberrations.

Anomaly # 15. Man/Officer stepping down from the curb glitch.
23-34-09 Apparent superimposition of a man in a beige uniform backing down from the curb. It appears they're trying to make it look like the same man is stepping down from the curb. It may even be the same person but I don't believe these two sections of tape belong together. In frames, 23-34-09 & 23-34-10, we can see that it doesn't appear that they do because there appear to be 2 shoulders in the first frame. The higher shoulder is from the original picture and the lower one is from the splice. Also, there's a couple of glitches/flicks of the picture that occur just prior to when the officer actually steps down from the curb. As the picture flicks, we are able to notice the arm of a person in a dark blue uniform positioned in front of the Officer. We can't see anything more than the person's arm and we don't see the person enter or leave the scene. This appears to represent a splicing of film.

Anomaly #16. We observe a black vehicle or truck that appears to pass by the scene of the incident a number of times. Though it appears to pass with different vehicles and in different lanes; the fact that we see it or so many black trucks passing in such a short time frame does raise a bit of suspicion. This is particularly true because there is a section of tape where the truck appears to enter the field of vision, the picture drops our and then it appears the same truck re-enters the picture and re-traces it's path once the picture comes back in. This could be indicative of the use of time-lapse photography on the left side of the film. Additionally, the double entry of the vehicle may be indicative of someone having stopped the film, re-wound it and re-started it during a tampering attempt but having failed to remove all traces of the time the vehicle initially entered that path of travel.

Transcript:
23-28-25 thru  23-28-57 Picture drop out with brief drop in of a few seconds or so in the middle. Unable to determine the frame #s of the brief drop in.

23-29-11 thru 23-29-16 Black truck passes with copper/gold car trailing.

23-29-30 thru 23-29-32 Picture having technical difficulties and O. Staab apparently talking to O. Copeland Though he isn't heard to answer and neither of them is seen on film.

23-29-32 thru 23-29-46 Picture drop out.

*In 23-29-39, the bottom of a black vehicle that appears to be the Truck is barely seen passing in lane 1 of the distorted picture.

Appeal 24

23-30-08- The picture begins dropping out.

23-30-16 thru 23-30-25 O. Staab heard, "Are you refusing to obey an officer?"

23-30-27 A black vehicle that appears to be the same black truck that has passed before and will pass again is just barely seen in lane 1 just about to pass when the picture drops out on this frame.

23-30-30- the picture returns.
23-30-31 thru 23-30-33 A black truck passes in lane 1.

Again, the sheer number of times we see a black truck passing arouses suspicion. The fact that it appears to enter the field of vision twice within a few seconds of each other is also a point of contention.

Anomaly #17. The arrival of the Jerome patrol car appears suspicious for a number of reasons. First, it appears that we are seeing 2 patrol cars coming or a duplicate of it's characteristic lights.

Transcript:
23-33-47- Golf cart or horse carriage type vehicle passes in lane 2.

23-34-05 flashing patrol car lights seen passing between vehicle to far left of screen.

23-34-06- Frame with apparently 2 patrol vehicles approaching with flashing lights or a frame showing A duplicate of the car.

23-34-06 The first pair of flickering lights (far left) disappear behind a northbound car. The second set Are still seen on screen immediately below the "05" section of the Secretary of State 7/1/05 stamp.

23-34-10 thru 23-34-12 Both sets of flickering lights are clearly seen separately.

23-34-15 front light becomes patrol car arriving and the second set of very bright lights appears to dissipate with the northbound vehicles obscuring our continued viewing of it.

There are other things about the arrival of the Jerome patrol car as viewed on the videotape. For example, there appear to be a series of lights sitting in the center of the recording that have no reason for being there. This actual intersection has a bridge-type abutment that would be in that portion of the scene. It isn't lighted and thus wouldn't appear the way it does on the AVR. The defendant believes that the lights were used by the fabricators to ensure proper placement of the Jerome car when they spliced it into the recording. The defendant believes that the entry of the Jerome car was intentionally fabricated so that the prosecution could place it's arrival later than it actually was in a direct effort to deprive her of a portion of her affirmative defense where she claimed excessive force was used to effect her arrest as a result of Officer Staab's unprofessional conduct.

Additional questionable observations that surround the arrival of the Jerome patrol car include:
1. The characteristic blinking lights of the Jerome patrol car appear to show themselves a number of times before the car is actually shown arriving on tape. If you watch the AVR from beginning to end there are a number of times when these characteristic lights show themselves. Sometimes when they occur they appear to dissipate into the lights of southbound cars as if they were mere reflections of the lights of those cars passing. Other times, they merely appear to simply dissipate. Again, the only way to be absolutely certain is to have the tape authenticated.

2. Loud levels of ambient noise accompanies the arrival of the Jerome patrol car. Again, per expert authenticators, high levels of ambient noise may be indicative of surreptitious editing. Per (Exhibit 0026, Page 3, Par. 3), "Equipment sounds- inconsistencies of context caused by the recording equipment itself. Common equipment sounds include hum, static, whistles, and varying pitches. " This characteristic was listed as one possible indicator of fabrication in the article.

3. There is also a bright burst of light and smearing of the photograph that immediately follows the arrival of the Jerome patrol car and it accompanies the loud burst of ambient noise described above. This could have been used to aid them in proper placement of the car and to disguise other things that would not quite match up during the immediate splicing of the two pieces of tape.

Anomaly #18. The Jerome officer appears to arrive 2 times.
23-34-25 thru 23-34-32 We see his head emerge out of the burst of light surrounding the patrol car and he walks in front of the defendant's vehicle and then onto the grassy knoll. There is a point at which he appears to be projected into his final position rather than to have actually walked there. However, the truth could only be verified through expert authentication.

23-34-53 thru 23-35-02 There are two officers standing in the foreground of the video. Behind them, we can see what appears to be Officer Tuxhorn walking on the grassy knoll on the right side of the film. This time he walks a slightly different path than the one just shown. This one is more in a straight line. Also, it appears that fabricators may have been trying to conceal the fact that he is re-tracing a portion of his previous path because there appear to be pixel-type squares over his face and other portions of his body. Also, there would naturally be a tendency for the eye to be drawn more toward the officers who are easily seen in the forefront of the frames talking directly in front of the patrol car. It may be that the fabricators don't want us to notice that O. Tuxhorn walked forward toward the SOS patrol car (on the right of film/grassy knoll) and then somehow ended up beyond the point at which his journey began only to walk a portion of the same path again. We never saw him go back to from whence he came so our logical question is how he could re-trace his steps when we never saw him go back?

Anomaly #19. There is an officer that appears to be interacting with something or someone whom we can't see. In frames 23-34-38 thru 23-34-40, the Officer who appears to be dressed in dark brown appears to have grabbed onto someone or something and appears to be squeezing between the Officer we see standing to his left and the unseen person or object to his right.

Anomaly #20. My foot appears to be doing the inch-worm in the right section of the tape. In fact, there is one point where it can be seen sliding into the viewing range of the film and the presence of pixel-type squares can be denoted.

Transcript:

23-32-50 My foot appears to have been dragged out of range of the film.
2332-52 foot is almost completely absent from the film.
23-33-01 my food is seen visibly sliding back into the range of the film and pixel- type squares can clearly be seen on the film.
23-33-06 A cop who appears to be dressed in beige is seen kneeling astride my foot.
23-33-08 The Intern walks over and stands in front of the Officer astride my legs blocking our view.
23-33-59 When the Intern walks away either the same or another officer is standing apparently looking down at me. However, the white dot that appears to represent my tennis shoe is seen being dragged to the right and off screen with the intern's shadow. This particular discrepancy can be best viewed on the CD version of the AVR.
23-34-07 My foot is seen completing an abnormal swiping motion to the right. It then disappears from view and apparently never re-enters the tape. Again, frame 23-33-01 appears odd. Why would I slide backwards like that so I can get my foot back into the range of film? Who acts like that?

Anomaly #21. The Secretary of State Clock doesn't appear to be functioning correctly but yet, it appears to keep time fairly accurately. This particular anomaly is difficult to quantify with exact numbers, etc because it is based upon mere seconds. However, if you merely watch the tape and attempt to count along with the seconds 1-1000, 2-1000, 3-1000, it becomes fairly apparent. There are times when seconds will move right along with what you would expect when you attempt to count the seconds off. There are also a number of

times when particular numbers will appear to hold for approx 1.5 seconds or so. They hang on long enough to be noticeably out of tempo. Further still, there are brief periods when the seconds are noted to peel off far too rapidly. Though the SOS clock can be observed apparently malfunctioning with the naked eye, it does appear to keep fairly accurate time. For example, I timed the section of tape that runs from 23-30-30 to 23-35-30 and it appeared to very closely correlate with the correct time. I came up with 4 minutes 47 seconds. This particular anomaly is most noticeable on the VHS copy of the audio recording.
Per (Exhibit 0031), time codes can be fairly manipulated. It stated, "A troublesome feature of time code is that its appearance on the tape does not mean that it was originally generated by the original equipment. Time code can also be employed to "stripe" the tape which means basically over-recording or erasing the original time code and then add additional time codes through the use of an external time code generator. As digital editing becomes more widespread, time codes of all types will become more vulnerable to tampering since like all information on the videotape they can be reduced to easily manipulate binary code."

There are a number of additional odd or questionable manifestations on the videotape. At any rate, the importance of having the audiovisual recording authenticated simply can not be overstated due to the sheer number of questionable manifestations occurring therein. The law is very clear. In instances where official misconduct is involved and there is reason to believe that evidence has been mishandled; the burden of proof rests with the prosecution to demonstrate that the evidence they used was reliable. Additionally, the defendant is entitled to a review where information is or may be available which exonerates. The AVR itself bears witness to the defendant's assertions of duress in that her vehicle's panic alarm was in fact initiated in very close proximity to the struggle with the police officers. That in and of itself serves as a excited utterance from which the court is able to glean the true intent of the defendant at the time the "crime" was committed. Furthermore, that the alarm is seen starting and stopping twice begs the question of exactly how long it did run. Finally, that all officers omit any reference to the alarm is particularly telling. The defendant thus requests that the court order the Prosecution to turn the original tape, recording device, and any other related items to a non-law enforcement agency affiliated mutually agreeable expert authenticator so that a full battery of exams can be performed on the recording. The defendant specifically requests that the following analysis be performed on the AVR:

Anomaly #22. In frames 23-30-17 thru 23-30-18 of the AVR, we hear what appears to be Officer Staab's voice stating something to the effect of, "Show your license and insurance card." I am uncertain of the first two words that are spoken. This statement occurs during an almost complete picture drop out. " The defendant believes that this statement is the result of over-taping for several reasons. First, the defendant asserts that no such statement was made to her after the initial portion of the incident that occurs before the AVR begins taping. Per (Exhibit 0029, page 914, par. 1), "Inconsistencies between written transcripts, summaries, or other reports and content of recording,: -- could qualify as a concern w/ regard for the defense counsel. Second, we do not see the speaker and per expert authenticators we can question the authenticity of any statement where we don't see the speakers or see only the backs of their heads. Third, Officer Staab's rate of speech during that sentence appears more rapid than the rate of her speech during all of the other statements she is overheard making on that recording. To the un-aided ear it sounds as if she is trying to complete her sentence within a specific period of time. Per (Exhibit 0026, page 3, par. 6 & 7), speed fluctuations and sudden changes in a person's voice should be questioned.

Anomaly #23. In frames 23-31-23 thru 23-31-27 and 23-31-46 thru 23-31-48 we see the rear lights of my 2004 Pontiac Grand Am flickering. In the first frames it flickers 5 times. In the second set of frames, it flickers 2 additional times. The lights are synchronized with intermittent horn blasts. That the horn blasts aren't heard in the recording raises the question of surreptitious tampering per (Exhibit 0026, page2, Par. 1), Original recordings should contain all of the audio information recorded at the moment in time that the event occurred. " That the sound isn't heard but the lights can be seen is problematic. Additional, the fact that the panic alarm was initiated at all raises reasonable doubt as to whether the defendant was demonstrating belligerence against the officers or was truly duress ridden and feared for her safety. That additional signs of tampering are readily observable in this AVR reaffirms the absolute necessity of a thorough evaluation in the interests of justice. Per (Exhibit 0029, Page 909, par. 11 & 12), A showing that no changes, additions, or deletions have been made in the recording, a participant in the conversation listens to the recording, identifies it, and testifies that it is accurate), are important w/ regard to verifying the

authenticity of a recording. Additionally, per (Exhibit 0029, page 910, par 10 & 12) recording is correct and fair representation, especially with respect to volume levels, appropriateness and voluntary disclosure of all editing, are important w/ regard to establishing authenticity of recordings. The absence of the sound of the panic alarm combined with the absence of several minutes' worth of it's recording is suspicious. Any editing that would have been performed to this AVR would have been done in secret/surreptitiously and therefore is all the more suspect.

***It is imperative that the court order that the original AVR used to prosecute the defendant and the recording device(s) used to create said AVR be turned over to a mutually agreeable non-law enforcement agency affiliated expert tape authenticator in order that an expert opinion can be obtained with regard to whether or not the tape is authentic or has been surreptitiously subjected to falsification efforts in the interests of justice and out of fairness to the defendant.***

The defendant believes an attempt to authenticate the AVR used to prosecute her would prove vital to demonstration that reasonable doubt exists. Per (Exhibit 0030, page 6, par 4.1), verification is predicated upon two sets of criteria:
a) that a person, whether a law enforcement official or any individual stated, if called upon, could or would testify under penalty of perjury, that the tape recorded evidence presented as the DOR is, in fact, the tape material utilized to create the recording at the exact time that the occurrence, interview, interrogation, or recorded content actually took place;
b) that by a comprehensive examination procedure and scientific means the FTA was able to determine that it is original.

*The defendant respectfully requests that the original AVR and recording equipment be turned over to the mutually agreeable expert as requested above because the defendant is entitled to use of the BEST EVIDENCE RECORDINGS with regard to her right to mount a defense and per the experts duplicates can not generally be authenticated though an expert may review them and offer a qualified opinion in the worse case scenario.
"The forensic examination of "tampered tapes" should include an inspection of the original tape(s) and the recorders used to produce the tapes. In the simplest case, the existence of an electronic edit and/or evidence of physical splicing will produce acoustic irregularities which can be viewed with instruments and documented." (Exhibit 0027, page 1, par. 2).

*The FBI Signal Analysis Branch has already acknowledged, "It is difficult to detect some alterations when a recording is digitized into a computer system, physically or electronically edited, and re-copied onto another tape," (Exhibit 0026, page 1, par. 4).

*The FBI's Signal Analysis Branch has developed a set of well defined procedures for the acceptance of authentication requests which provides an excellent overview for what the government considers to be essential for a scientifically valid tape analysis:
1. Sworn testimony or written allegations by defense… of tampering or other illegal acts…
2. The original tape must be provided. Copies of a duplicate tape can not be authenticated and are normally not accepted for examination by the FBI
3. The tape recorders and related components used to produce the recording must be provided; and,
4. Written records of any damage or maintenance done to the recorders, accessories, and other submitted equipment must be provided…," (Exhibit 0027. Page 3, top portion of page).

**The defense hereby requests that the original AVR and recording device(s) be turned over to the mutually agreeable non-law enforcement agency affiliated expert tape authenticator because duplicates can not normally be authenticated as per the FBI's Signal Analysis Branch, and Brue E Koenig, Authentication of Forensic Audio Recordings. Journal of Audio Engineering Society, 38 No. ½, 1990, Jan/Feb. page 4. (Exhibit 027, page 3 near bottom, & page 7, Source #4).

*Appeal 25*

The defense further requests that the court authorize said expert tape authenticator to perform any exams whatsoever that he determines necessary with respect to arriving at the most informed decision as to whether or not the defendant's tape has been falsified, including, but not necessarily limited to the examinations mentioned below:

Critical Listening-- review of the tape by an expert with high quality head phones and professional recording equipment in an attempt to discover or rule out common aural anomalies and rendering of his expert opinion as to whether any manifestations are indicative of falsification (Exhibit 0026, page 3, Paragraph 6 & 7).

Expert physical inspection f the original AVR- to determine whether observable splices or other evidence of tampering exists. (Exhibit 0026, page 3, par. 8).

Magnetic Development- by an expert to determine whether evidence of falsification exists (Exhibit 0026, page 3, par. 9). Magnetic development test- application of a special fluid which under proper magnification will make visible the head track.  Configuration, off-azimuth recordings, stop/start functions, damage to recording heads, etc. Such test enables examiner to determine whether the submitted tape is a

copy, has been over-recorded, or was made on a different recorder than the one submitted. (Exhibit 0027, Page 4, par. 2).

Spectrum analysis- examination of the AVR in order to determine whether any anomalies are present which are indicative of tampering (Exhibit 0026, page 3, par. 10).  Spectrum analysis can be used to measure slightly different signals transmitted through the microphone or telephone equipment (Exhibit 0027, Page 4, par. 2).

Wave Form Analysis- which would enable the expert authenticator to measure and identify whether any record-mode events are present which are indicative of falsification (Exhibit 0026, page 4, par. 11). One of the more important pieces of equipment used in forensic video examinations is a wave form monitor which is a specialized oscilloscope.  It displays the voltage versus time modes and has specialized circuits to process the signal.  If any editing occurs, then its possible to display the signal aberrations on the display screen of the instrument (Exhibit 0027, page 4, par. 3) Waveform Analysis is mentioned as a means of authentication in Exhibit 0028, pg. 1, #l).

Vector Scope Measurements of chrominance, hue, and burst of color videotapes- It measures the chrominance information and allows for the examination of matching bursts of multiple signals.  It also permit's the investigation of edit points. (Exhibit 0027, Page 4, par. 4).

Cross Pulse Monitor examination of vertical, interval, and horizontal information- "Cross pulse" information can be viewed on a cross pulse monitor and with proper application one can often determine if the videotape is a copy or an original.  In cases where the helical heads are out of alignment, a set of marks could exist for each succeeding generation or copy. (Exhibit 0027, page 4, par. 4).

Frame-By-Frame Inspection with waveform monitors, vector scopes, and a cross pulse monitor together with other forensic equipment as deemed appropriate. It must be noted that there are sophisticated production studios that can edit videotapes in such fashion that traditional methods of detection are no longer adequate.  (Exhibit 0027, page 4, par. 5).

Perform Test Recordings- on evidential recorders and accessory equipment which could enable the expert authenticator to identify the possible origins of questionable tones or sounds occurring on the AVR (Exhibit 0026, pg. 3, par.12).

Other Examinations- Exhibit 0028, page 1 lists a number examinations, including, audio and Time Code Track Analysis, RF envelope analysis, recorder test, Dihedral error exam, Defective Pixel exam, HBI, VBI,

Appeal 26

Mistracking, Examination for Front & Back Porch errors, and compare test tape to original tape signatures.

Operating Condition- The defendant would like for the court to accept her testimony under penalty of perjury asserting that the AVR provided to her via her attorney most likely contained an obstruction to viewing. She testifies that it was very labor- intensive to attempt to view the AVR because she seemingly had to press play every few seconds or so and thus never was able to observe the tape w/ any kind of continuity that would have afforded her the opportunity to clearly mount a defense. The defendant questioned her attorney about the quality of the tape during her trial. However, she abandoned any attempt toward attempting to obtain another recording during the trial because the tape appeared to show her kicking the officers and she was never able to determine whether the presence of her vehicle's panic alarms were in-fact going off or not due to the large amount of fuzz/static present in the tape recording and she now knows due to the fact that the vast majority of the pulsations having been removed from the tape. Based upon what she could view of the tape, it appeared that not a shred of exculpatory evidence remained so she abandoned any hope of being able to prove her affirmative defense. The defendant did not know such thing as an obstruction to viewing existed at the time that she submitted her copy of the AVR to a commercial videograper for repair and thus she was not able to obtain, nor retain any material evidence verifying that such obstruction had been intentionally placed within her copy of the AVR tendered by the prosecution. However, the defendant is able to provide strong circumstantial evidence bearing witness to the fact that such obstruction did exist. First, (Exhibit 0086, photocopy of receipt for purchase of one duplicate tape). This document verifies that I did retain the services of a commercial videographer. On one occasion, (Labor Day Weekend), I paid for him to transfer the AVR tendered to my by the prosecution from one tape cartridge to another and to make one additional VHS copy of the tape. At that time, I did not request, nor was I given a receipt. Later, I contacted him to request an additional VHS copy and 2 CD formatted versions be made of the tape. I wanted to obtain a duplicate VHS in order to be able to at least forward one copy to the court. Additionally, I requested the CD formatted versions because I wanted to be able to review the recording frame by frame without causing damage to the AVR. Per (Exhibit 0116, "Fact" section), "Every time a videotape is played, the quality degrades…, Pausing and rewinding a certain segment is even more brutal on the tape, and the segment that receives this treatment is virtually always the most important part of the tape from an evidentiary perspective." That the defendant paid for a commercial party to repair her copy serves as partial corroboration of the existence of the obstruction to viewing. Additionally, the fact that the defendant requested a duplicate copy of the AVR in writing at least 3 times and to date has not received one serves not only as verification of the fact that the obstruction to viewing existed but also to the fact that the Prosecution is fully aware of it and did not wish to aid the defendant in her efforts to enforce her compulsory right to exculpatory evidence. Exhibit 0012 is a photocopy of the defendant's written request to the IL. Sec. of State's Office for a duplicate copy of the AVR used to prosecute her and proof of mailing. The Sec. of State's Office/Police Office forwarded a letter back to the defendant re-directing her to contact the County Clerk's Office, or Court Administrator. The defendant is not certain which office she was re-directed to. She phoned one office, and then the other. Finally, she was referred to the IL. Prosecutor's Office. She phoned there twice and reached the Prosecutor's vmail. She phoned again and requested help from someone else but the attendant refused to give the defendant her name, insisted that as far as she knew they won't honor such requests, and haughtily informed the defendant that her only option was to call back for ASA Noll or leave a ph# where he could contact her. The defendant terminated the phonecall and followed up in writing. The defendant tendered a letter to ASA Knoll on 11/11/7/06 informing him of the fact that she was requesting a duplicate copy of the recording because she was conducting a review of her case as her own attorney, that she wanted to receive the duplicate copy within 2 weeks to aid in her review, and that she had enclosed a $20 money order toward that end. A copy of the letter and proof of purchase of the money order is attached (Exhibit 0082, 0083). As of 1/10/07, the request had gone unanswered and a second request was mailed in the same manner except that no additional money order was forwarded. (Exhibit 0112). That the defendant made so many requests for the duplicate and never received a reasonable and timely answer is quite telling in so far as circumstantial evidence goes.


Visual Observation for presence of splices- If a physical splice is locat ed, the splice shall be noted and

photographed or videotapes at the time of observation. (Exhibit 0030, page 7, par. 5).

<u>DORD Condition-</u> Inspect the DORD and any accompanying apparatus to determine that they are operational and can play back the DOR without damage occurring to the DOR or DORD (Exhibit 0030, page 7, par 6).

<u>Other Examinations-</u> * Exhibit 0030 goes on to describe a number of other kinds of observations or examinations. Some of them have been described above. The defendant wishes that any chosen Expert Tape Authenticator/Evaluator be authorized to conduct any generally approved examinations or observations described herein that he believes would be helpful in terms of determining whether the original AVR is authentic or fabricated.

<u>Comparison of Original Recording to AVR tendered to the Defendant's Attorney-</u> The defendant respectfully requests that the VHS and CD duplicate AVRs that the defendant has tendered to the court herein be forwarded to the chosen expert tape authenticator and that said authenticator conducts a comparison of the two to determine whether they are identical in terms of their aural and visual content. The reason for this is that it is possible for a person to make a duplicate copy of the original recording and subject the copy to all manner of falsifications and then tender the original to an expert authenticator. Such effort could result in the authentication of the original copy of evidence and yet be entirely invalid with respect to whether the AVR used in the prosecution of the defendant was falsified. Therefore, the defendant wishes that the chosen authenticator compare the versions and note in writing whether there are any substantial differences with regard to their aural and visual content. This request is particularly important with regard to establishing the duration of panic alarm activation, with regard to whether it can be established that Officer Staab did or did not inform the defendant of the arrest and request that she comply with placing her arms behind her back, and with regard to whether the defendant was screaming belligerent things about O. Staab ("Fat Fucking Bitch), or duress-ridden, exculpatory things ("Lying, Fucking Bitch). Per (Exhibit 0031, Page 3, Par. 2), "The two major categories of alteration include: 1) that associated with splicing, erasure, and re-recording where changes do occur to the original source recording and; 2) when an altered copy or an enhanced copy (either audio or video) is re-recorded with no physical change done to the source recording. In other words, the actual alteration that is observed occurs always in the re-recorded tape or "edited master", and not on the original source recording.

Per (Exhibit 0029, page 915, par. 5), Importantly, if there is official misconduct or an unreported break in the chain of custody, or if a talented, well equipped, and determined would-be falsifier either creates or gains access to the audio recording in question, then that recording may turn out to have been falsified, whether or not most or all of these guidelines have been followed. Again, it is imperative that the AVR used to prosecute the defendant be subjected to an authentication evaluation. If it can be established that the tape ahs been falsified, it is vitally important to the defendant's case because it would verify the defendant's assertions that exculpatory evidence has been intentionally despoiled and that the State of Illinois et.alt. are responsible for having violated a number of the defendant's Constitutionally guaranteed rights.

In conclusion, The defendant respectfully requests that the court reverse her criminal conviction, enter judgment of acquittal, and order immediate ex-pungement of her criminal history because sufficient evidence exists  to verify that the defendant's rights were violated by an Un-Constitutional arrest which was characterized by the use of excessive force delivered with intent to entrap the defendant by reason of her likely fight or flight manifestation. Further evidence demonstrates that the State of Illinois remained willfully blinded to the defendant's repeated requests for an investigation which would have cleared her name & unearthed the true nature of the incident. Further evidence suggests that the State of Illinois willingly permitted Officer Staab and others to engage in a selective/malicious prosecution of the defendant characterized by the use of perjury and evidence tampering in order to obtain her wrongful conviction. The State of Illinois sanctioned these abuses of processes in order to conceal the violation of the defendant's Constitutional rights and thereby avoid their responsibility to compensate her for the barratry of  abuses under which she suffered.

Appeal 28

As a result, the defendant respectfully requests that the court order the aforementioned remedies with regard to rectifying the state of affairs concerning her current criminal conviction.  Additionally, the defendant respectfully requests that the court grant the specific remedies she requests in her lawsuit against the parties named herein for the original Constitutional Rights infractions they sought to conceal with their malicious prosecution and  with respect to the Constitutional Rights Infringements that occurred as a result of the vicious prosecution.

Emergency Request For Relief.

The defendant is filing this request for emergency relief because she is simultaneously filing an appeal from a wrongful conviction and a Lawsuit Based on State Governmental Violations of a number of her Constitutionally Guaranteed Rights. The State Government accused of committing barratry against her is also her employer. Furthermore, strong circumstantial evidence exists which demonstrates that the State of Illinois has recklessly placed her in danger because the State of Illinois failed to properly supervise police officers in the performance of their duties in order to ensure that they were not involved in official misconduct which could endanger private individuals, and then encouraged, aided, and abetted police officers in their attempts to carry out repeated abuses of process and a malicious prosecution of the defendant in an effort to deceptively conceal the fact that one of their officers had violated the defendant's Constitutionally Guaranteed Rights and they owed her a fiduciary duty of recompense.

The situation is as follows:

IL. Secretary of State Police Officer Staab violated the defendant's right to be informed of the reason for any administrative proceeding that is taking place during a traffic stop. In so doing, she violated the defendant's right to be informed and she did so in such a manner as to intentionally leave the defendant with the impression that her rights to be free from unlawful search and seizure were being violated. Officer Staab instigated and escalated the incident so that she could arrest the defendant and in so doing entertain her ride-a-long intern.

Officer Staab then intentionally perfected the arrest simply by grabbing at the defendant from behind without informing her that the arrest was imminent and without first providing her with an opportunity to surrender peaceably in order that she could use the defendant's fight or flight reaction against her. This was done in order to secure a chargeable offense. That would enable her supervisors to prosecute the defendant and thereby aid her in concealing her wrongful acts-- an act that she knew they would prefer over paying the defendant the reparations she was owed.

Strong circumstantial evidence exists which demonstrates that the prosecution of the defendant was wrongful and malicious. This evidence includes the fact that the defendant filed multiple formal complaints with multiple agencies alleging official misconduct on the part of Officer Staab. She filed with the State of IL. Prosecutor's Office, State of IL. Office of Inspector General, and the State of IL. Secretary of State's Office-- to name a few. The State agencies refused to investigate the defendant's claims and yet they fully and vigorously prosecuted the defendant on the basis of Officer Staab's complaint. The State's financial motivation in the case is readily apparent. What is now clear is that all of the State's best evidence used to prosecute the defendant is fabricated. It is now clear that the State's primary witnesses, arresting officers Staab and Copeland commit nearly 20 instances of verifiable perjury in the written documents tendered to the court. We can verify the inaccuracy of their statements by comparing the hard evidence (written reports and AVR evidence). There are nearly 20 instances where they do not coincide. Additionally, the proof that the inaccuracies constitute perjury is the fact that they consistently paint the defendant in a negative, belligerent light. Finally, there are at least 20 visual or auditory anomalies present on the AVR evidence which are often associated with a fabrication effort. This information demonstrates with an extremely high degree of probability that the defendant's Constitutional Rights were violated by the State of IL and that a conspiracy of deception by malicious prosecution was being used to cover it up.

THE DEFENDANT IS FILING THIS REQUEST FOR AN EMERGENCY PRELIMINARY HEARING IN ORDER TO SECURE THE AID OF THE COURT IN SAFEGUARDING HER POSITION OF EMPLOYMENT, HER INCOME, AND HER PERSONAL SAFELY UNTIL SUCH TIME THAT HER CASE IS CONCLUDED. Toward that end, the defendant respectfully requests the following:

The defendant requests that her employer, the Illinois Department of Revenue be ordered to immediately place her under the protection of Administrative Leave and continue to provide her with coverage for all of her pay, employment, employment privileges, and benefits covering any time she has to be absent from her job site due to preparation to appear at any court hearing or proceedings, participation in any court hearing,

or proceedings and covering a reasonable amount of travel time, lunches, breaks, personal, vacation, and sick leave benefits until her case is concluded and she receives the first installment of any court ordered reparations or such time that her case is otherwise disposed of.

The defendant requests that the court grant an immediate stay absolving her of any responsibility to participate in the Sangamon County Probation /Court Supervision program(s) and ceasing her required monthly payment of any and all court ordered probation fees, court fines, or any other charges whatsoever associated with this case.

The defendant further requests that provisions be made to provide for her personal safety and the safety of her family members should the need arise. The State of IL has encouraged or aided uniformed officers in the commission of crimes (namely perjuring themselves) in order to engage in a conspiracy to cover up the initial Constitutional Rights Violations they perpetrated against her and to enable them to continue their barratry by committing new ones against her on a daily or monthly basis. The State of IL was so eager to punish the defendant for some presumed wrong (telling someone off), that they were willing to commit even greater crimes (perjury, Conspiracy, Extortion, Racketeering, Tampering with Audiovisually Recorded Evidence) ! They have encouraged police officers to break the law-- something they can be prosecuted for. WHAT KIND OF MAJOR MALFUNCTION DO SO-CALLED PROFESSIONAL GOVERNMENTAL OFFICIALS HAVE TO HAVE IN ORDER TO ACT LIKE THAT!? Police officers have been trained to use weapons and have direct access to them. Now I am in a position where I have to choose between suffering in silence or fighting to be free, clear my name, and request much needed and well deserved reparations-- an act which in and of itself exposes their criminality. Due to the willful and intentional misconduct of my government officials, I have to endanger myself or suffer in silence! The defendant respectfully requests that the State of Illinois be required to assume as proactive a stance with regard ensuring her personal safety and that of her family as they have in terms of recklessly endangering them in the past.
Toward that end, the defendant respectfully requests the following:

1. In the event that the defendant's welfare or the welfare of her family members is threatened, the defendant and any family members shall be immediately afforded the protection of a sufficient number of U.S. Marshalls to provide for their absolute physical safety round the clock. The entire cost of providing such care to the defendant and any endangered family members shall be borne solely by the State of IL. Such care shall commence if either direct threats are received or if the defendant merely feels that such care is necessary. It shall conclude once danger is no longer imminent and the endangered persons are secure in a place away from any threat of harm.

2. The defendant requests that the State of Illinois be required to Indemnify her family against the loss of her companionship through any wrongful death. Toward that end, the defendant respectfully requests that if she should suffer a violent or suspicious death or a death due to bombing, explosion, unexplained or suspicious fire, gunfire, stabbing, physical assault, suspicious vehicular accident, poisoning, unexplained fall from a high surface, plane crash, or any other unexplained or suspicious death within the next 60 years the State of Illinois shall be liable for immediate payment of the following sums :

$30 million to be equally divided amongst her siblings, parents, maternal and paternal grandmothers, and Ethel Burton.
$20 million to be provided to the sibling that assumes custodial care of her minor child to be used to provide for the care and maintenance of her minor child and to cover the child's college expenses. One of the defendant's siblings was given written documentation regarding her preferences with regard to whom should assume the care of her minor child in approx 8/2006. That sibling will come forward in the event of the defendant's untimely death.
$20 million to be placed in an interest-bearing account and held there until the defendant's minor child reaches 25 years of age at which time the proceeds shall begin to issue out in equal monthly installments that shall begin on the minor child's 25th birthday and continue until her 65th birthday.

The defendant is filing 3 separate causes for claim. She is appealing a wrongful conviction that was obtained through the use of multiple and repeated denials of due process including evidence tampering, perjury, and official misconduct. She is filing for emergency relief designed to safeguard her employment and property rights and her physical safety and that of her family members. Finally, she is filing a cause of claim to request that other Constitutional Rights violations that have been perpetrated against her be rectified. THE DEEFNDANT HEREBY REQUESTS PERMISSION TO HAVE HER EMERGENCY RELIEF REQUEST BE HEARD AS SOON AS POSSIBLE BECAUSE SHE HAS BEEN SEVERELY ABUSED BY HER STATE AND LOCAL GOVERNMENTS AND IS IN NEED OF THAT PROTECTION IN ORDER TO PUT AN END TO THE BARRATRY THAT IS CONTINUING TO DATE. THE DEFENDANT ADDITIONALLY REQUESTS TO BE ABLE TO PRESENT BOTH HER APPEAL AND HER CAUSE FOR CLAIM ON HER CONSTITUTIONAL RIGHTS VIOLATIONS CONCURRENTLY AND TO THE SAME JURY.    The Defendant respectfully requests permission to do so for the following reasons:

1. The causes for claim are intrinsically entwined. In fact, the defendant alleges that had it not been for a Conspiracy to conceal the violation of her Constitutional Rights; there would have been no prosecution and thus no wrongful conviction. The only way to fully understand and appreciate the cause of claim for the appeal is to appreciate and understand the cause of claim for the Constitutional Rights violations and vice versa.

2 Because the causes are entwined, it is imperative that they be conducted concurrently. In fact, it would be unjust to compel the defendant to try to litigate them separately. The only reason the defendant is now able to bring her cause for claim on the Constitutional Rights violations is because she has successfully been able to prove that the State of Illinois has been involved in something that no government should be involved in--- actively breaking the law. Had she not been able to bring strong circumstantial evidence to bear, her cause for claim on her Constitutional rights violations, though authentic; would not have been believed by anyone! The State of Illinois owes the defendant the small courtesy of being able to litigate the two issues as compactly as possible as a consequence of their impropriety.

3. Concurrent litigation of the two issues would also preserve the time and staffing resources of the court because issues that affect both claims can be delivered only once instead of at-least twice.

THE DEFENDANT REQUESTS THE FOLLOWING FORMS OF RELIEF FROM HER WRONGFUL
CONVICTION AND FROM THE BARRATRY OF ABUSES OF PROCESS PERPETRATED AGAINST
HER BY HER STATE AND LOCAL GOVERNMENTS.

1. Grant the defendant's request to have both her appeal of her criminal conviction and her lawsuit heard
concurrently and by the same trial court. Neither claim is self-sustaining and to hear them separately would
violate the defendant's right to be able to present a clear defensive argument. Additionally, neither case can
be fully understood without the substantiating evidence of the other. These cases are largely dependent
upon the forensic examination of the AVR used to prosecute her case and upon the totality of the
circumstances. The totality of the circumstances of this case can only be fully appreciated when the two are
litigated together. Additionally, doing so would cause the court minimal disruption and enable the court to
make the most efficient use of it's staffing and time resources.

2. Grant the defendant's request to have the AVR used to prosecute her evaluated for an objective, expert
analysis in accordance with the following criterion:
A. Order the appropriate Prosecution Team Members (Prosecutor/Sec. of State Police Dept., or others) to
Timely surrender to an objective, mutually agreeable, expert tape authenticator not currently affiliated with
any law enforcement entity or agency  the original & best evidence recording of the AVR used to prosecute
the defendant's tape along with the recording device(s) that created the original recording for forensic
examination. The Mutually agreeable, objective, expert, non-law enforcement affiliated tape authenticator
should perform the following AVR examinations and render his best testimonial and written opinion as to
whether the AVR used to prosecute the defendant was falsified in any manner along with an explanation of
the reasons he arrived at his conclusion.
B. Order that the cost of the forensic examinations and provision of the expert testimonial and written
opinions be tendered to the court at State of Illinois expense and that the State of Illinois provide timely
payment and other necessary forms of compliance to the expert authenticator in order to see that the
examination can be performed and performed timely.
C. The designated authenticator should perform any/.all of the following examinations he deems necessary
or appropriate and any other generally accepted methods of examination in order to arrive at his conclusion
and they should be performed in an order beginning with the examination that is least damaging to the
original recording to the one that is most damaging in order that the expert can glean the greatest amount of
objective evidence form the original AVR before it becomes degraded:

*Critical Listening
*Expert Physical inspection of the original AVR for splicing or other signs of tampering
*Magnetic Development
*Spectrum Analysis
*Wave Form Analysis
*Vector Scope Measurements of Chrominance, hue, & burst of color videotapes
*Cross Pulse Monitor
*Frame by Frame Examination with wave form monitors, vector scopes, & cross pulse monitor together
with other forensic equipment as deemed appropriate or necessary by the expert authenticator
*Perform test recordings on submitted recording devices
*Other examinations (audio & time code track analysis, RF envelope analysis, recorder test, Dihedral error
exam, Defective Pixel exam, HBI, VBI, Mistracking, exam for front & back porch errors, and compare test
tape to original tape signatures.
*The defendant also requests that the expert authenticator receive a copy of the portion of the defendant's
court filing that discusses the Anomalies she believes she observed on the AVR used to prosecute her. She
is specifically requesting that he render his expert opinion as to whether or not these anomalies are in fact
the result of falsification.
*Compare the best original AVR recording to the copy of the AVR tendered to the court by the defendant
and note any differences particularly with regard to the presence  & duration of the visual and auditory
firing of the defendant's vehicle's panic alarm and sequencing of events or the possibility of missing frames.
The defendant believes they may have created a second tape from the original and doctored it in order to
prepare the AVR used to prosecute her with while retaining the actual original in tact just in case she were

savvy enough to demand tape authentication. By so doing, the original could be authenticated and come back with a decision favoring the State even though they were in-fact involved in wrong doing. Thus, the defendant deems it necessary for the expert authenticator to determine whether the two versions are indeed identical.

**\*\*The defendant's request for tape authentication is indeed the hallmark of her case. If in fact, the State of Illinois has been involved with something so seemly as tampering with evidence it absolutely confirms the defendant's claims that she was innocent and that the State of Illinois used deception to intentionally mischaracterize her fight/flight reaction as an act of belligerence in order to cover up their involvement in an unlawful arrest characterized by the use of excessive force. If the tape has been falsified, they are without excuse. What excuse can they possibly give for having surreptitiously modified an AVR used to prosecute a very serious crime. If they have falsified the recording then intentional spoilage of evidence rules apply and all benefit of the doubt must go to the defendant!**

3. Grant permanent Injunction against Sangamon County and State of Illinois Prosecutors' Offices requiring them to conspicuously post notices at their customer counters informing criminal defendants of their right to an unlimited number of duplicate recordings upon request and informing them of what actions they may take to safeguard their rights in the event that they suspect that their audiovisually recorded evidence has been falsified.

4. Grant permanent injunction against the State of Illinois requiring them to upgrade their vehicle fleet so that all patrol cars are equipped with audiovisual recorders that automatically begin to record whenever the patrol car's lights and/or siren are activated and requiring them to post on public accessible web-sites information disclosing which vehicles are so equipped, which are not, and the purchase date and requisite unit numbers of the vehicles.

5. Grant defendant's request for a subpoena for her Sept 2005 phone record (217) 522-1493. That phone record can verify that the defendant did have a phone conversation with Captain Pippen of the Sec. of State Police Dept. He responded to her inquiry regarding the current status of her formal complaint with the following retort, "Oh, you mean you're calling about the FELONY!? The defendant insisted she was calling about her formal complaint. He stated the case was currently classified as a Felony and they generally don't do anything about our complaints until the court has at least finished with the case. The defendant didn't understand how her case could be classified as a felony at that point if he had reviewed the tape. Thus, she asked him if he had at least looked at the video. He stated, "The videotape has been placed into evidence. " The defendant asked him a second time whether he had seen the video and his reply to her was the same. The subpoena could verify that the defendant did in fact phone him and can show that the State of Illinois is complicit in the Conspiracy against the defendant. **The defendant is 100% certain the AVR used to prosecute her was fabricated.** Thus, either the Secretary of State Police Department's Chain of Evidence handling is faulty, or they are intentionally participating in the Conspiracy to use deception to obtain the wrongful criminal conviction of the defendant. In either case, they are culpable, they are without excuse, and they are 1000% wrong!

6. Grant the defendant's request for recompense for the pain and suffering she endured as a result of the Conspiracy to use deception in order to secure a wrongful criminal conviction against her and thereby illegally deprive her of her liberty and her money. The co-conspirators involved O. Staab, O. Copeland, Captain Pippen, O. Tuxhorn, the Secretary of State, and other natural and persons. The defendant is asking the non-natural person--State of Illinois to cover these damages because of it's overall involvement and failure to intervene on the defendant's behalf-- intervention they owed her because of the investigatory and protective duties entrusted to the agencies they defendant contacted for assistance.

$1,000,000.00

7. Reverse the defendant's wrongful conviction and enter a judgment of acquittal.

8. Grant the defendant's request to be reimbursed for pain & suffering associated with an 11/2003 Unconstitutional Traffic detention that caused emotional distress in her minor child.

                                                                  $300,000.00

9. Grant defendant's request to be reimbursed for unnecessary harassment, infliction of emotional
   Distress and the fabrication of a reason to arrest the defendant 7/1/05.        $400,000.00

10. Grant the defendant's request to be reimbursed for the perpetration of an unlawful arrest
    7/1/05.                                                                         $700,000.00

11. Grant the defendant's request to be reimbursed for the use of excessive force to effect the
    Unlawful arrest, physically punish the defendant, and entrap her.              $900,000.00

12. Grant the defendant's request to be reimbursed for her unlawful detention in the
    SCADC.                                                                          $600,000.00

13. Grant the defendant's request to be reimbursed for SCADC guard Anselman's attempt to break the
    Defendant's arm/wrist.                                                        $1,000,000.00

14. Grant the defendant's request to be reimbursed for the multiple instances of abhorrent
    Abuse that she suffered while in the custody of the SCADC.                     $800,000.00

15. Grant the defendant's request to be reimbursed for the improper use of the Isolation Room as a
    Means of punishment along the fact that the defendant was forced to urinate upon herself while therein
    Because the staff refused to provide her with bathroom privileges.            $900,000.00

16. Grant the defendant's request to be reimbursed for the pain and suffering that she experienced
    As a result of having been Tazed simply because she informed the SCADC staff members of her
    Desire to invoke her right against self- incrimination and would not answer any questions whatsoever
    Without an attorney being present.                                           $1,000,000.00

17. Grant the defendant's request to be reimbursed for the pain and suffering she experienced as a result of
    the SCADC's failure to facilitate the defendant's requests to receive medical care that was actually present
    In the facility.                                                               $450,000.00

18. Grant the defendant's request to be reimbursed for the pain and suffering she experienced as a result of
    the tortuous interference that she experienced at her workplace and for the State of Illiniois' intentional mis-
    handling of her complaint which qualified for whistle-blower protection in a manner that caused her to
    appear to be the guilty party.                                               $1,054,000.00

19. Grant the defendant's request to have Vacation, Sick, and Personal time away from work that was used
    to defend herself against these charges or to obtain assistance in dealing with the untoward effects of these
    charges credited back to her by the Illinois Dept. Of Revenue. The defendant expects to be able to deliver
    to the court an accounting of the amounts of time involved within the next 60 days.

                                        Vac._____
                                        Pers._____
                                        Sick_____

20. Grant the defendant's request to have both the Illinois Department of Revenue and the Illinois Division
    of Central Management Services issue the defendant letters clearing her of any wrong doing with regard to
    the allegations that the Officers made against her and reinstating her employment record to the blemish- free
    state it was in prior to the receipt of their allegations.

21, Grant the defendant's request to receive reimbursement for the pain and suffering she experienced as a
    result of the Prosecution & State of Illinois' having knowingly tendered a perjurious disclosure document to
    the Court with the express purpose of illegally depriving the defendant of her freedom and of her

*Relies 4*

Money.                                                              $1,000,000.00

22. Grant the defendant's request to receive reimbursement for the pain and suffering she experienced as a result of the illegal misappropriation of her physical likeness, voice, and personal effects for unauthorized use in a video production for the sole purpose of obtaining her wrongful conviction.
                                                                   $10,000,000.00

23. Grant the defendant's request to be reimbursed for the pain and suffering she experienced as a result of her having been forced to provide written letters of apology to cops that committed crimes against her at the Prosecutors' insistence. He forced her to apologize to her abusers while knowing that she was wholly innocent.                                                          $1,000,000.00

24. Grant the defendant's request to be reimbursed for the pain and suffering she experienced as a result of having been knowingly & wrongfully convicted of a crime on the basis of perjury, extortion, racketeering, and evidence tampering.                                    $1,000,000.00

25. Grant the defendant's request to be reimbursed for the involuntary servitude/forced completion of an Anger management program as a result of her wrongful & illegally obtained conviction.
                                                                   $400,000.00

26. Grant the defendant's request to be reimbursed for the involuntary servitude or forced completion of 40 hours of community service as a result of her wrongful & illegally obtained conviction.
                                                                   $1,000,000.00

27. Grant the defendant's request to be reimbursed for the involuntary servitude or forced completion of a 2 years' probation program as a result of her wrongful and illegally obtained conviction.
                                                                   $600,000.00

28. Grant the defendant's request to be reimbursed for the fact that she was illegally deprived of private property without due process of law or through the use of extortion ($3100.00) and racketeering and for the resultant physical, mental, emotional suffering and financial hardship the loss of her funds caused.
                                                                   $403,100.00

29. Grant the defendant's request to be reimbursed for the probation fees paid to date along with recompense for the pain and suffering due to the unavailability of funds for her family's usage.
                                                                   $200,600.00

30. Grant the defendant's request to be reimbursed for the need to hire an attorney ($1250.00) and the resultant financial, emotional, mental, and physical hardship the loss of those funds had on her family.
                                                                   $201,250.00

31. Grant the defendant's request to be recompensed for the fact that the State of Illinois and others knowingly engaged in a malicious prosecution and intentionally inflicted emotional distress in the defendant and her child without just cause.
                                                                   $2,000,000.00

32. Grant the defendant's request for her Insurance Company to be reimbursed their out of pocked Costs in terms of providing care to the defendant for her resultant injuries.

        ER Visits, MD visits, Medications              $1,394.61
        Psychotherapy                                  _____

33. Grant the defendant's request for reimbursement of her out of pocket expenses.
     ER Visit, MD visits,  Medications                         $230.00
     Psychotherapy                                             _____

*Defendant expects to be able to tender to the court the total amounts of expenditures within 60 days of the filing of her claim.

34. Grant the defendant's request to be reimbursed for the pain and suffering she endured as a result of Sangamon County's intentional or grossly negligent abuse of process in terms of mis-handling her notice to appear in court in a manner which caused great hardship to her.          $400,000.00

35. Grant the defendant's request to be reimbursed for the violation of her eight to due process under the law in terms of the multiple instances of willful ignorance, dereliction of duty, and failure to discharge the investigatory and protective standards of care they owed to the defendant on the part of a number of State and County offices.  The defendant is requesting $1,000,000.00 per office that failed to appropriately discharge their duties.                               $1,000,000.00

36. Grant the defendant s request to be reimbursed for the State of Illinois' failure to properly supervise their employees in the performance of their duties, to firmly establish standards governing the ethical conduct that is expected of them and to appropriately discipline their employees when they deviate from the applicable standards.                            $1,000,000.00

37. Grant the defendant's request to be reimbursed for the illegal search of her residence, illegal seizure of her private property or dog, and to be reimbursed the sums of money that she paid out to retrieve him or can expect to pay out in order to recover ownership of him as expressed in the records of the AVID corporation. The defendant also requests to be recompensed for the resultant emotional distress to her minor child and for the disruption of her holiday funds as a result of the improper seizure.

                                                              $200,281.50

38. Grant the defendant's  request for reimbursement of her investment of time in legal research and defense of self.                                          $32,760.00

39. Grant the defendant's request for reimbursement of the costs she incurred in terms of photocopying the documents that she needed to file her court documents.          $_____.
40. Grant the defendant's request to recoup the cost of postage spent mailing her requests for legal assistance and/or her letters of formal protest.             $112.34

41. Grant the defendant's request to recoup the cost of the money order she forwarded to ASA Gray Noll in order to request a duplicate copy of the AVR used to prosecute her.        $21.00

42. Grant the defendant's request to recoup the cost of photo/film development. $26.74

43. Grant the defendant's request to recoup the cost of  AVR repair and the purchase of
     Duplicate copies in order that she could forward them to the court of appeals.
                                                              $55.00.

44. Grant the defendant's request that the State of Illinois have full responsibility for reimbursing the defendant all of her court ordered recompense and that they meet with the other defendants that are not natural persons (Sangamon County, Southernview, Jerome, etc) on their own to determine how they will divide their liability and reimburse one another.  The State of Illinois was the prime mover throughout the entire period of barratry.
The defendant and her family has been inconvenienced enough by their abusive acts of barratry and their overall lack of concern for her welfare and that of her family.  The recoupment of her damages should thus be as easy as possible.  She should be able to look to one party to reimburse her and have only one phone

call to make in the event that her checks do not materialize. The defendants have already demonstrated that they are fully capable of collaborating in order to harm and abuse the defendant and thus the court can have full faith in their ability to collaborate in order to divvy up the damages amongst themselves.

45. Grant the defendant's request that the low level government participants be assigned some measure of liability as a result of her judgment. All too often, the government officials involved in wrong-doing are not held accountable for their actions. Thus, they are far too lax in terms of acting with dignity, integrity and fairness at heart. When they feel no personal liability for rectifying situations in which they have harmed others they far too often don't care about whether they have acted appropriately because in the end, their Uncle Sam picks up the tab. The defendant, thus requests that the low level agents who have acted with extreme malice toward the defendant be forced to reimburse their employers or the State of Illinois a portion of the damages awarded to the defendant in the following amounts based upon their levels of culpability in this case and their approximate annual income. The defendant requests the following:

O. Staab to reimburse her employer $12,900.00 over the next 6 years which amounts to three times the hardship the defendant incurred in terms of the money she was expected to pay as a result of her wrongful conviction ($3100.00 in fraudulent medical expenses, and 24 months worth of $50 probation fees payable over 2 years).

O. Copeland to reimburse his employer or the State of Illinois $12,900.00 over the next 6 years which amounts to three times the hardship the defendant incurred in terms of the money she was expected to pay as a result of her wrongful conviction ($3100.00 in fraudulent medical expenses, and 24 months worth of $50 probation fees payable over 2 years).

O. Tuxhorn to reimburse his employer or the State of Illinois $3225.00 over the next 6 years which amounts to one fourth the amount of damages that the defendant is asking O. Staab and O. Copeland to reimburse. The defendant is making this request because he is partly liable for the Conspiracy in that the defendant has reason to suspect that he did go to the defendant's workplace along with O. Staab and Copeland to tell lies to her employer about her having threatened them with her job. Additionally, he did not tell the entire truth regarding the incident-- stating only that he heard the defendant swearing at the officers but failed to render the exculpatory portion of her speech. Finally, he also intentionally omits any mention of the firing of the defendant's vehicle's panic alarm and the defendant is entirely confident that the report is going to come back showing that a significant period of time that likely showed the firing of the lights has been removed from the tape used to prosecute the defendant. Thus, he is absolutely involved in the Conspiracy. However, the defendant recognizes the allegiance that officers owe one another. He was unlikely to see the defendant ever again and yet his fellow officers could be called upon to get there to save his life tomorrow. They can easily take their time in responding if he isn't seen as a team player. Furthermore, the defendant wishes for him to be given consideration for the compassion he demonstrated to her on the night of the incident. When she was sitting on the ground, screaming frantically and setting off her panic alarm, he yelled out, "What do I have to do to get you to calm down!? His tone was one of, "Just what in the world is going on!? However, his words were those of compassion and demonstrated caring. Additionally, when the defendant was in the car and her handcuffs were cutting into her right arm, she began kicking the window and he was the only one who even bothered to come over. He asked her what she needed and she cursed at him and said her cuffs were too tight. He asked her to ask him nicely. When she failed to do so, he left. She began kicking the door again and he came to see about her yet again despite the fact that she had already been nasty to him once. She told him again that the cuff was too tight. He again told her that if she could not ask nicely it would remain on. Then she threatened him stating, "Well nothing had better happen to my hand, then." He then said, "Well, alright then and he gingerly took her wrists in his hands and loosened the cuff as much as he could. He didn't even handle her arms roughly as others had. Yes, he was 100% complicit in the conspiracy against the defendant, but he was the only person who showed her compassion the night the incident occurred and he did so regardless of how nasty she had been to him. He is absolutely deserving of credit for having acted like that!

Capt. Pippen (Il. Sec. of State PD) to reimburse his employer of the State of Illinois $25,800.00 over the next 12 years which amounts to twice the liability of O. Staab because he was her supervisor and he is

absolutely implicated in the conspiracy as evidenced by the statements he made to the defendant when she phoned to inquire about the status of her formal complaint.

Guard Anselman (Sangamon Co. Adult Detention Center Guard) to reimburse his employer or the State of Illinois $12,900.00 over the next 6 years for his role in terms of inflicting physical and psychological pain upon the defendant while she was handcuffed. His abuse was no less painful and no less called for than the abuse O. Staab exacted on the defendant when she caused a physically abusive arrest to occur instead of a non-violent one.

Guards Curry, Kirby, & Bennanoit (Sangamon County Adult detention Center) to reimburse their employer or the State of Illinois $3200.00 over the next 4 years for their role in abusing the defendant in the Tazer event. Though they were following orders, the order was not entirely lawful and it was abusive. The excuse of simply following orders is not sufficient to entirely absolve anyone of their direct level of responsibility/complicity.

Female and Male Guards Unknown (Sangamon County Adult Detention Center) to reimburse their employer or the State of Illinois $3200.00 over the next 4 years for their role in terms of threatening the defendant with mace simply because she refused to take a shower. They could not have known that the defendant's refusal to shower was directly related to the physical assault perpetrated against her by Anselman. However, there was no reason for them to threaten her simply because she exercised her right to refusal of self-care. They had already told her she could not have a cot if she did not comply and she had already agreed that it would be so. She had already been forced to lie on the floor in the isolation room anyhow and thus there would have been absolutely no change in the accommodations provided her.

Sgt. Guy (Sangamon Co. Adult Detention Center Supv.) to reimburse his employer or the State of Illinois $25,800.00 over the next 12 years because he was abusive to the defendant and the position he holds within his department is a supervisory one not entirely unlike that of Capt. Pippen. It is his role to set the tone for what occurs therein and his tone was one of abusiveness and callousness-- a complete lack of regard for the defendant's plight.

Sec. of State Jesse White (State of Illinois) to reimburse his employer, the State of Illinois $50,600.00 over the next 12 years which amounts to twice the liability of Capt. Pippen because of his governmental and leadership role, his likely participation in the conspiracy to deceptively imprison the defendant and extort funds from her, and his overall failure to set clear standard for the ethical behavior of his staff members within the IL. Sec. of State police department, failure to appropriately supervise them in the performance of their duties, failure to insist upon ethical standards for decency and integrity of contact, failure to appropriately train his employees and inform them of their responsibility to uphold absolute integrity at all times, and for his failure to discipline them when they fell short of such expectation.

46. Grant the defendant's request that the:
*Total amount of the financial relief that is ordered for the defendant be considered to be entirely due and payable immediately upon the rendering of such judgment, but that the State of Illinois can deliver the payments to the defendant in the amount of $2 million per year in equal monthly installments and incur a 5% per year interest that is due on the balance of the award that remains unpaid, and order that the monthly disbursements begin within 30 days of the court order.
* That the State of Illinois shall be the one entity that is directly responsible for ensuring that the defendant receives all of the court ordered financial relief and that they are to collaborate with the other defendants in the case who are not natural persons in order to distribute the losses amongst themselves as they choose.

47. Grant the defendant's request that Prosecutorial immunity be stricken from the law books. Absolutely no one needs to be absolved from a responsibility to act within the bounds of the law to do their legitimate job. For far too long, Prosecutorial immunity has been used as a crutch in order to justify all manner of mayhem and wrong-doing. Prosecutorial immunity is not specifically authorized by the U.S. Constitution.

Relief 8

In fact, a large reason for the original Bill of Rights was to specifically limit all hands of the Government or King of England and the one most likely to become abusive in terms of it's dealing with the citizens was absolutely the investigatory/prosecutorial arm of the government. The entire Bill of Rights was devised to specifically hold that arm of the government in check and yet we have this remaining remnant which has been systematically used to oppress persons-- particularly the racial minorities and indigent persons of little financial means. Prosecutorial immunity may have been upheld in cases in the past where persons claimed he knew or should have known that the person was innocent. Perhaps it could be upheld there because there is a need to balance the individual's right to justice with at least a minimal guarantee that crimes will be prosecuted. Clearly, there is a need for the government to be able to defend itself against frivolous lawsuits or those in which there is merely a slight unintentional omission by the prosecutor in which the case ends up in a miscarriage of justice. However, for far too long, Prosecutors have been free to actively engage in conspiracies such as the one perpetrated against the defendant and to enjoy absolute and complete immunity from willfully breaking the law. This absolutely can not be condoned by this court or any other. To do so invites anarchy. As aforementioned, Former Supreme Court Judge Brandeis stated, "Decency, Security, and Liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to it's citizens. In a government of laws existence of the government will be imperiled if it fails to observe the law scrupulously. Crime is contagious. If the Government becomes a law breaker, it breeds contempt for the law; it invites anarchy." In this case, the sole purpose of the Prosecutor's involvement is one of defrauding the defendant. The prosecutor absolutely knew that the defendant's arrest was unlawful and characterized by the excessive use of force designed to illicit a fight or flight reaction which could be deceptively used to charge the defendant with a felony and thereby conceal the fiduciary responsibility that the State of Illinois owed the defendant. In fact, State of Illinois officials had to remove several minutes' worth of the defendant's exculpatory screaming and the firing of her panic alarm before they could even hope to be able to bring charges. No one would have convicted the defendant of a Felony or any other crime if they would have heard her duress-ridden screaming that the officer was a liar and setting off her vehicle's panic alarm for 8-10 minutes. They absolutely know that or they would not have attempted to conceal it. This case is fundamentally unique in that it is entirely obvious that the Prosecutor's only involvement is one of illegally using deception in order to create the impression that the defendant committed a crime in order to conceal the fact this his employer owes the defendant a fiduciary duty with regard to the actual commission of crimes to her instead. The Prosecutor's entire case is based upon an Abuse of Process that was being used to initiate and carry on a Malicious Prosecution. In other words, the Prosecutor's sole reason for being involved in this case is to actively break the law by engaging in illegal tactics. The court absolutely can not condone such activity. To do so would bring discredit upon itself and every other level of government. To do so is to invite anarchy. Many other cases exist in which the Prosecutor has withheld exculpatory evidence. However, the defendant is not aware of any in which he does so merely to conceal the fact that his employer has already broken the law and the defendant was the party that was harmed by that illicit act.

**Prosecutorial immunity has out-lasted it's beneficial period-- if there ever was one. Initially, perhaps it was a good tool. We have seen arguments that it was the one tool that permitted the government to discharge it's investigatory and prosecutorial duties effectively. However, far too often, when we give a person an inch; he takes a mile. Currently, nation-wide, prosecutors are taking liberties in the performance of their duties which are absolutely unauthorized by the U.S. Constitution and are actively engaging in breaking the law. Once finished, they hold up their "prosecutorial immunity" card in much the same manner that the South African Crime lords held up their "diplomatic immunity" cards in the movie Lethal Weapon. This kind of official mis-conduct has been systematically used in this country and is obviously over-used in the prosecution of racial minorities and the financially indigent. That the "justice" system is not equal in it's administration of "justice" has long been known. One need only review the financial and racial composition of the nation's prisoners to determine that. Thus, we can conclude that Prosecutorial immunity is one technique that has and continues to contribute to the systematic and continued miscarriages of justice that are so relatively manifest in our Criminal Justice System today. Yet today, the vast majority of Prosecutors are most often male, and most often, white. As a result, the phenomenon of social distance is absolutely involved here and absolutely manifests itself in a disproportionate heavy-handedness being delivered against racial minorities and the financially indigent-- persons the**

prosecutor can not identify with as easily as he can persons who have social characteristics more closely related to his.  Apparently, justice for some people matters and justice for others does not. The defendant is one of the such persons who seemingly has no claim to justice.  She is specifically requesting that Prosecutorial immunity be stricken down because it is not specifically authorized by the U.S. Constitution or Bill or Rights, because it serves no useful or positive purpose in the criminal justice system, because it readily lends itself to any illicit desire to engage in illegal activity and or miscarriages of justice against persons who are already largely discriminated against in society generally, because it renders total and complete immunity to persons who chose to actively break the law or otherwise engage in official misconduct that is not necessary in the performance of their jobs and which absolutely runs contrary to the interests of the fair administration of justice and because we can presume that it is and has been systematically involved in a great many number of cases in which miscarriages of justice have been perpetrated against racial minorities and financially indigent persons in the nation.  This kind of mis-use of prosecutorial immunity has been running rampant and being over-used for quite some time and perhaps nowhere is it more clearly seen or displayed as it has been in this case.  Prosecutorial immunity is enabling prosecutors to actively engage in the very criminal activities the are supposed to be eradicating and to fact absolutely no penalty for having actually broken the very laws they are sworn to uphold.  How can society possibly benefit from that?

48. Grant the defendant's request that if any portion of the relief that she has been granted is determined to be unlawful or un-enforceable for any reason, the remainder of the forms of relief that are ordered in her case will remain fully in tact and enforceable.

49. Reimburse defendant the $ 350.00 Federal Court Lawsuit filing fee.